EXPO-CHEM, INC., CEMCO, INC., MILJAC, INC, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Expo-Chem, Inc. v. Commissioner
Docket No. 23058-81.
United States Tax Court
T.C. Memo 1983-212; 1983 Tax Ct. Memo LEXIS 574; 45 T.C.M. (CCH) 1351; T.C.M. (RIA) 83212; April 19, 1983. *574 1. In March 1976, Expo delivered $155,000 to Miljac, a related corporation. Miljac used the funds to purchase chemicals that it intended to sell to Expo for export. Market conditions changed, and Miljac eventually sold the chemicals domestically and returned the deposit to Expo. Expo reported the deposit on Schedule L of its Form 1120-DISC as a qualified export asset. Held, such deposit did not constitute a qualified export asset within the meaning of sec. 993(b), I.R.C. 1954. 2. In August 1976, Expo delivered $155,000 to Cemco, its parent corporation. Cemco was to use the money as a security deposit in guaranteeing purchases made by Expo. The deposit was to be held by Cemco for a period of not less than 3 years, and Cemco was to pay interest of 5 percent per annum. Expo reported the deposit on Schedule L of its Form 1120-DISC as a qualified export asset. Held, such deposit did not constitute a qualified export asset within the meaning of sec. 993(b), I.R.C. 1954. 3. Because Expo's deposits with Miljac and Cemco were not qualified export assets, less than 95 percent of the adjusted basis of Expo's assets were qualified export assets as of March 31, 1976 and as of March *575 31, 1977, and Expo therefore failed to qualify as a DISC for those years. Sharon L. Aresco, for the petitioner. Robert J. Percy, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: By statutory notice dated June 12, 1981. Respondent determined the following deficiencies in the petitioners' Federal income taxes: Petitioner
Year Ended
Deficiency
Expo-Chem, Inc.
3/31/76
$1,869.00
Expo-Chem, Inc.
3/31/77
304.00
Cemco, Inc.
12/31/73
2,210.00
Cemco, Inc.
12/31/74
43,443.00
Miljac, Inc.
4/30/75
17,978.00
Miljac, Inc.
4/30/76
26,438.00
After concessions, [1] the ultimate issue for decision is whether Expo-Chem, Inc. (Expo) qualified as a domestic international sales corporation (DISC) for its taxable years ending March 31, 1976 and March 31, 1977. The resolution of that issue is dependent upon whether certain transfers of funds by Expo to its parent corporation, Cemco, Inc. (Cemco), and to a related corporation, Miljac, Inc. (Miljac), constituted qualified export assets of Expo within the meaning of section 993(b). [2] *576 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Cemco, Miljac, and Expo all had their principal place of business in New Canaan, Connecticut, when they filed their petition in this case. Cemco, Miljac, and Expo timely filed their income tax returns for their respective taxable years ending December 31, 1973 and December 31, 1974 (Cemco), April 30, 1975 and April 30, 1976 (Miljac), and March 31, 1976 and March 31, 1977 (Expo) with the Internal Revenue Service Center in Andover, Massachusetts. Cemco and Miljac were "brother-sister" corporations engaged primarily in the purchasing and selling of chemicals. One hundred percent of the stock of Cemco was owned by Howard Von Oehsen. One hundred percent of the stock of Miljac was owned by Mr. Von Oehsen, his wife, and his children. Mr. Von Oehsen was the sole salesman for Cemco, Miljac, and Expo. Expo was incorporated April 19, 1974, as a wholly-owned domestic subsidiary of Cemco. Expo engaged primarily in the *577 export sales of chemicals and qualified as a DISC under section 992 for its taxable year ended March 31, 1975. During Expo's taxable periods in question, the Arab oil embargo, shortages of raw materials for the production of petrochemicals, and rapid fluctuation in the value of United States currency created an extremely unstable international chemical market. Major chemical suppliers allocated their supplies of chemicals on the basis of prior purchases by their customers. Chemical buyers who did not pay for their current purchases on "net 30 day terms" had their future allocations withdrawn by suppliers. It was difficult or impossible for Expo to directly purchase chemicals or to obtain credit because it had not dealt with suppliers in its own name prior to its taxable years in question. In order to meet the anticipated quantity requirements of its customers, Expo arranged to have Cemco and Miljac purchase chemicals for it. During the periods in question, Expo purchased approximately 100 percent of its inventory from Cemco and Miljac. On March 9, 1976, Miljac ordered approximately one and one quarter million pounds of phtalic anhydride (phtalic) at a cost of approximately $258,390. *578 During the 2-year period prior to this purchase, phtalic was in short supply and Miljac had been unable to purchase a substantial quantity of it at one time. This purchase was substantially larger than any prior single purchase of phtalic by Miljac, Cemco, or Expo. Miljac did not have the financial resources to pay for this purchase of phtalic on "net 30 day terms." On March 26, 1976, Expo deposited [3] $155,000 with Miljac. Miljac used all or a portion of the deposit from Expo to complete the purchase of the phtalic. None of the phtalic from the purchase was ever designated on Miljac's books of account or otherwise as belonging to Expo. Expo recorded the deposit on its books of account as "advances to suppliers" and reported the deposit on its tax return (Form 1120-DISC) for its taxable year ending March 31, 1976 as a trade receivable. (Expo concedes that the reporting of the deposit as a trade receivable was incorrect.) The deposit represented approximately 86 percent of *579 the adjusted basis of all of Expo's assets as of March 31, 1976. Prior to the purchase of phtalic on March 9, 1976, the three corporations had sold large quantities of phtalic domestically and on the export market. As of March 31, 1976, Miljac and Expo anticipated that phtalic from the March 9 purchase would be sold to Expo at some future date and that Expo would resell the phtalic on the export market. Miljac, however, was under no obligation to sell any of the phtalic to Expo, and Expo was under no obligation to purchase any of the phtalic from Miljac. Expo had made no efforts to sell the phtalic and had no particular customers in mind as of March 31, 1976.
Subsequent to March 31, 1976, Miljac decided to sell the subject phtalic domestically itself rather than to Expo, and to return the deposit of $155,000 to Expo. None of the phtalic from the March 9 purchase was ever sold by Miljac to Expo. On July 1, 1976, Mr. Von Oehsen was injured in a swimming accident. As a result of this accident, he was partially incapacitated for a period of time. He was able to conduct some business from his home relatively soon after the accident via telephone if someone held the telephone for him. *580 He put most of his effort during this period toward his domestic chemical business. By letter to Expo dated August 5, 1976 signed by Mr. Von Oehsen as President of Cemco, Cemco stated that it understood that Expo was about to receive its $155,000 deposit back from Miljac. The letter demanded that this sum be deposited with Cemco as a security deposit for the stated purpose that Cemco was guaranteeing Expo's purchases. The letter further stated that Cemco would repay that sum with interest at 5 percent per annum after a period of not less than 3 years. On August 9, 1976, Miljac returned the sum of $155,000 to Expo. Expo immediately transferred that sum to Cemco. Expo recorded this transfer to Cemco on its books of account as "advances to suppliers" and reported $131,386 on its tax return (Form 1120-DISC) for its taxable year ending March 31, 1977 as a trade receivable. (Expo concedes that the reporting of the deposit as a trade receivable was incorrect.) This amount was the balance of the original $155,000 deposit after Cemco repaid $5,000 October 20, 1976, and charged Expo with $18,614 of expenses allocated to Expo after an Internal Revenue Service examination of the returns *581 of both corporations. The balance of the deposit represented approximately 96 percent of the adjusted basis of all of Expo's assets as of March 31, 1977. Between May 1976 and August 1976, Cemco purchased chemicals, some of which were expected to be eventually sold to Expo for its export sales. At the time Expo made the deposit with Cemco, however, neither corporation contemplated any specific purchase of chemicals for the export market. When Expo's anticipated sales did not materialize, Cemco sold the chemicals domestically. The balance of the deposit was unpaid through the time of trial. Petitioners' gross receipts for their taxable years in question were as follows: Taxable Year
Total Gross
Company
Ending
Receipts
Expo
3/75
$1,568,251
Expo
3/76
315,845
Expo
3/77
7,846
Cemco
12/74
$1,368,756
Cemco
12/75
1,462,120
Cemco
12/76
1,454,497
Cemco
12/77
551,777
Miljac
4/75
$5,618,931
Miljac
4/76
2,471,630
Miljac
4/77
2,332,592
Expo's accumulated DISC income for its taxable years ending March 31, 1976 and March 31, 1977 was $149,719 and $131,906, respectively. ULTIMATE FINDINGS OF FACT 1. Expo's deposit with Miljac was not a qualified export asset. 2. Less than 95 percent of the adjusted basis of all the assets of Expo *582 were qualified export assets as of March 31, 1976. 3. Expo's deposit with Cemco was not a qualified export asset. 4. Less than 95 percent of the adjusted basis of all the assets of Expo were qualified export assets as of March 31, 1977. OPINION At the time of enactment of the DISC legislation, sections 991-997, Congress explained the reasons for such provisions as follows: [Y]our committee believes that it is important to provide tax incentives for U.S. firms to increase their exports. This is important not only because of its stimulative effect but also to remove a present disadvantage of U.S. companies engaged in export activities through domestic corporations. Presently, they are treated less favorably than those which manufacture abroad through the use of foreign subsidiary corporations. United States corporations engaging in export activities are taxed currently on their foreign earnings at the full U.S. corporate income tax rate regardless of whether these earnings are kept abroad or repatriated. In contrast, U.S. corporations which produce and sell abroad through foreign subsidiaries generally can postpone payment of U.S. tax on these foreign earnings so long as they are *583 kept abroad. [H. Rept. No. 92-533 (1971), 1972-1 C.B. 498, 529.] [4]
In general, a corporation that qualifies as a DISC is not taxable on its profits. A portion of such profits is currently taxable to the shareholders, and tax is deferred on the remaining portion of the profits until such profits are actually withdrawn from the DISC or until the corporation ceases to qualify as a DISC. One of the requirements for this special tax treatment is that at least 95 percent of the adjusted basis of all the assets of the corporation at the close of its taxable year must be qualified export assets. Section 992(a)(1)(B). Such test is designed to ensure that substantially all of the DISC's assets are devoted to exporting. H. Rept. No. 92-533, supra,1972-1 C.B. at 529. See CWT Farms, Inc. v. Commissioner,79 T.C. 86, 91, supp. opinion at 1054 (1982). The term "qualified export assets" is defined by section 993(b). That section provides that to be a qualified export asset, an asset must fall into at least one of nine categories. [5] *585 Petitioners *584 contend that the deposits in question fall within the category defined by section 993(b)(4). Section 993(b)(4) provides that qualified export assets include, "money, bank deposits, and other similar temporary investments, which are reasonably necessary to meet *586 the working capital needs of such corporation." "In usual and ordinary acception * * * [money] means coins and paper currency used as circulating medium of exchange, and does not embrace notes, bonds, evidences of debt, or other personal or real estate." Black's Law Dictionary 906 (rev. 5th ed. 1979). In each transaction in issue, Expo transferred $155,000 to a related corporation. It is possible, though doubtful, that the funds were thereafter held by the transferee as "money." It is more likely that they were, at least for some period of time, bank deposits. In either case, however, the funds, as "money" or bank deposits, were no longer held as such by Expo. The term "temporary investment" is defined by section 1.993-2(e)(1), Income Tax Regs., as follows: In general. For purposes of this section, temporary investments are money, bank deposits (not including time deposits of more than 1 year), and other similar temporary investments to the extent maintained by a DISC as reasonably necessary to meet its requirements for working capital. For purposes of this paragraph, a temporary investment is an obligation, including an evidence of indebtedness as defined in paragraph (d)(1) of *587 this section, which is a demand obligation or has a period remaining to maturity of not more than 1 year at the date it is acquired by the DISC. A temporary investment does not include trade receivables. [Emphasis supplied.] Obviously the advance by Expo to Cemco, which was to be repaid in not less than 3 years, would not be a temporary investment under this definition. But neither the deposit with Miljac nor the deposit with Cemco would otherwise qualify. The pertinent part of section 1.993-2(e)(4), Income Tax Regs., provides, "An obligation issued or incurred by a member of a controlled group (as defined in sec. 1.993-1(k)) of which the DISC is a member is not a qualified export asset under this paragraph." Expo, Miljac and Cemco were members of a controlled group as defined in section 1.993-1(k), Income Tax Regs., [6] *588 and thus obligations of Miljac or Cemco to Expo cannot be qualified export assets under section 993(b)(4). It is therefore unnecessary to consider whether either deposit was "reasonably necessary" to meet Expo's working capital needs. [7] *589 The conclusion here reached is confirmed by an analysis of the provisions under which a loan by a DISC can constitute a qualified export asset, i.e., qualification under the "producer's loan" category set forth in section 993(b)(5) and 993(d). Section 993(b)(5) provides that qualified export assets include obligations arising in connection with a producer's loan as defined in subsection (d). Section 993(d)(1) states that an obligation, subject to certain rules not applicable to this case, shall be treated as arising out of a producer's loan if each of four requirements are satisfied. [8] *590 Petitioners do not, and obviously cannot, contend that those requirements are met. Congress was concerned that tax-deferred DISC profits might be used by DISC's parent for purposes unrelated to exporting. See Surrey, Summary of Arguments Against DISC Proposal, 117 Cong. Rec. 41722 (Nov. 17, 1971). Congress therefore provided strict guidelines that must be met before a loan by a DISC will constitute a qualified export asset. It would be inconsistent with legislative intent to allow a DISC to advance tax-deferred profits to its parent (or other members of a controlled group) without satisfying the requirements of sections 993(b)(5) and 993(d) by merely labeling such advance a "temporary investment." Inasmuch as the successive advances by Expo to Miljac and Cemco do not fit into any other category of qualified export assets under section 993(b), [9] less than 95 percent of the adjusted basis of all of Expo's assets at the end of each year were qualified export assets. By reason of its *591 failure to meet this asset test, Expo failed to qualify as a DISC for its taxable years ended March 31, 1976, and March 31, 1977. Decision will be entered under Rule 155.
Footnotes
1. The Court acknowledges and appreciates the parties' efforts at settling subsidiary issues by stipulation after trial. ↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended, in effect during the years in issue.
3. The use of the word "deposit" and derivatives thereof is for narrative convenience only and is not intended to indicate any legal conclusions concerning the actual substance or legal effect of the transactions.↩
4. See generally Durbin Paper Stock Co. v. Commissioner,80 T.C. 252 (1983); CWT Farms, Inc. v. Commissioner,79 T.C. 86, 90↩, supp. opinion at 1054 (1982).
5. Section 993(b) provides: (b) Qualified Export Assets.--For purposes of this part, the qualified export assets of a corporation are- (1) export property (as defined in subsection (c)); (2) assets used primarily in connection with the sale, lease, rental, storage, handling, transportation, packaging, assembly, or servicing of export property, or the performance of engineering or architectural services described in subparagraph (G) of subsection(a)(1) or managerial services in futherance of the production of qualified export receipts described in subparagraphs (A), (B), (C), and (G) of subsection(a)(1); (3) accounts receivable and evidences of indebtedness which arise by reason of transactions of such corporation or of another corporation which is a DISC and which is a member of a controlled group which includes such corporation described in suparagraph (A), (B), (C), (D), (G), or (H), of subsection(a)(1); (4) money, bank deposits, and other similar temporary investments, which are reasonably necessary to meet the working capital requirements of such corporation; (5) obligations arising in connection with a producer's loan (as defined in subsection (d)); (6) stock or securities of a related foreign export corporation (as defined in subsection (e)); (7) obligations issued, guaranteed, or insured, in whole or in part, by the Export-Import Bank of the United States or the Foreign Credit Insurance Association in those cases where such obligations are acquired from such Bank or Association or from the seller or purchaser of the goods or services with respect to which such obligations arose; (8) obligations issued by a domestic corporation organized solely for the purpose of financing sales of export property pursuant to an agreement with the Export-Import Bank of the United States under which such corporation makes export loans guaranteed by such bank; and (9) amounts (other than reasonable working capital) on deposit in the United States that are utilized during the period provided for in, and otherwise in accordance with, regulations prescribed by the Secretary or his delegate to acquire other qualified export assets.↩
6. Sec. 1.1993-1(k), Income Tax Regs., provides: Definition of "controlled group". For purposes of sections 991 through 996 and the regulations thereunder, the term "controlled group" has the same meaning as is assigned to the term "controlled group of corporations" by section 1563(a), except that (1) the phrase "more than 50 percent" is substitued for the phrase "at least 80 percent" each place the latter phrase appears in section 1563(a), and (2)section 1563(b) shall not apply. Thus, for example, a foreign corporation subject to tax under section 881 may be a member of a controlled group. Furthermore, two or more corporations (including a foreign corporation) are members of a controlled group at any time such corporations meet the requirements of section 1563(a) (as modified by this paragraph). Under section 1563↩, the parent-subsidiary relationship of Cemco and Expo and the brother-sister relationship of Cemco and Miljac constituted the three corporations a "combined group." 7. We have considered the transactions between Expo and Miljac and the transactions between Expo and Cemco separately, and have examined independently the effect of each on the status of Expo as of the end of each of the years in issue, as requested by petitioner.The same legal analysis applies to both, however, and it seems unnecessary to repeat the discussion as to each transaction.
8. The four requirements are: (A) the loan, when added to the unpaid balance of all other producer's loans made by the DISC, does not exceed the accumulated DISC income at the beginning of the month in which the loan is made; (B) the obligation is evidenced by a note (or other evidence of indebtedness) with a stated maturity date not more than 5 years from the date of the loan; (C) the loan is made to a person engaged in the United States in the manufacturing, production, growing, or extraction of export property determined without regard to subparagraph (C) or (D) of subsection (c)(2), (referred to hereinafter as the "borrower"); and (D) at the time of such loan it is designated as a producer's loan. See CWT Farms, Inc. v. Commissioner,supra↩ at 92-95.
9. Expo's controller testified that the advance to Miljac "was categorized as a prepayment for the material that we might be buying from suppliers." Under other circumstances, such prepayment might constitute the acquisition of inventory under section 993(b)(1) and 993(c). The facts found here, however, do not justify such a categorization. In considering the evidence, we note that a statutory notice of deficiency is ordinarily presumed correct, and the taxpayer bears the burden of persuasion (the ultimate burden) and the burden of going forward with the evidence. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. In determining whether a corporate-petitioner has satisfied the burden of proof, dealings between it and related corporations are subjected to particularly close scrutiny. See Gilbert v. Commissioner,262 F.2d 512 (2d Cir. 1959), affg. a Memorandum Opinion of this Court, cert. denied 359 U.S. 1002 (1959); Field v. Commissioner,T.C. Memo. 1974-25↩.