ADVANCE INTERNATIONAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ADVANCE MACHINE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7749-87, 7750-87.        Filed September 6, 1988.

*Alan W. Granwell* and *Michael Quigley,* for the petitioners.

*Beth L. Williams,* for the respondent.

WHITAKER, *Judge:* Respondent issued statutory notices of deficiencies to petitioners[1] Advance Machine Co. (Machine) and Advance International, Inc. (International), on December 29, 1986. In the statutory notices respondent determined that International did not qualify as a domestic international sales corporation (DISC) during its fiscal years 1980, 1981, and 1982. Respondent determined the following deficiencies (which result from taxing International's DISC income to both entities in the alternative):

MACHINE

| Years ending Dec. 31— | Deficiencies | Additions |
|---|---|---|
| 1979 | $466,358 | - - - |
| 1980 | 346,802 | - - - |
| 1981 | 591,550 | - - - |

---

[1]These cases were consolidated for purposes of trial, briefing, and opinion by order dated Mar. 15, 1988.

INTERNATIONAL

| Years ending Jan. 31 — | Deficiencies | Additions |
|---|---|---|
| 1980 | $559,731 | - - - |
| 1981 | 713,941 | - - - |
| 1982 | 696,938 | - - - |

The parties have since stipulated that International qualified as a DISC for its fiscal year ended January 31, 1982. After concessions, the only issue remaining is whether, for the fiscal years ended January 31, 1980, and January 31, 1981, the adjusted basis of International's qualified export assets equaled or exceeded 95 percent of the adjusted basis of all of its assets. See sec. 992(a)(1)(B);[2] sec. 1.992-1(c), Income Tax Regs. The resolution of this issue depends upon whether the debit balance in International's intercompany clearing account at the end of each of the years in issue is export property such that the amount in the account should be included in International's qualified export assets.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Machine and International are U.S. corporations whose principal places of business are, and were at the time the petitions in these cases were filed, in Spring Park, Minnesota. Machine was incorporated in 1926 and International was incorporated in 1972. Machine owned 100 percent of International's issued and outstanding stock at all times from International's incorporation through the years in issue.

Machine is engaged in the business of manufacturing and selling floor cleaning, scrubbing, and polishing machinery, vacuum cleaners for commercial and industrial use, floor maintenance equipment, and related accessories. These products are sold domestically and exported.

Machine sold its products in the export market for approximately 10 years before availing itself of the advantages of the DISC provisions and forming International. Commencing with its taxable year ending January 31, 1973,

---

[2] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

and during the years in issue, International was responsible for, and caused Machine's export products to be sold and distributed outside the United States. Machine manufactured all of the export products generating the receipts reported on International's DISC returns, and all of International's sales consisted entirely of export property manufactured or purchased by Machine. During each year in issue, 95 percent or more of International's gross receipts, as defined in section 993(f), met the definition of qualified export receipts set forth in section 993(a)(1)(A).

International consistently operated as a buy-sell DISC during the years in issue and was a fully operational corporation, maintaining its own staff of employees, and hiring distributors who were responsible for soliciting, processing, and making sales of export products in the foreign market. As a buy-sell DISC, International acted as purchaser and reseller of Machine's export products. International computed its DISC taxable income in an amount equal to 50 percent of the combined taxable income of International and Machine plus 10 percent of International's export promotion expenses attributable to export receipts. Sales transactions were accounted for in International's general ledger accounts. When a sale occurred, International debited trade accounts receivable in the amount of the export sales, at the aggregate invoiced sales price for the month and credited its sales accounts in the same amount. To record collection of accounts receivable from export customers, International debited its cash in bank accounts for the amount of the cash received from export customers and credited trade accounts receivable for the same amount.

Periodic cash transfers to Machine and charges for cost of goods sold were also recorded in the general ledger accounts. To record intercompany transfers of funds, International debited the intercompany clearing account with Machine in the amount of the cash transfer to Machine.[3] To

---

[3]During the month International credited accounts payable in the amount of the transfer of cash to Machine. This entry created a liability on International's books. Each month, after the bank reconciliation was completed, International debited accounts payable in approximately the amount of the transfer of cash, which removed the liability previously created. In addition, each month after the bank reconciliation was completed, International credited cash in bank accounts in the amount of cash transferred to Machine reflected earlier in the debit balance of the intercompany clearing account.

account for the cost of sales, International debited its cost of sales accounts in the amount of the standard costs incurred by Machine attributable to export sales, including variance allocation, and credited the intercompany clearing account with the standard cost of sales attributable to export sales, making adjustments to record variances to standard costs on a monthly basis.

The balance in the intercompany clearing account never reached zero during the years in issue; amounts were routinely transferred to Machine,[4] and costs of goods sold were continuously being credited to the account, along with the monthly adjustments to the account. When International completed its DISC returns for the years in issue, it listed the debit balance of the account as of the end of each fiscal year as a qualified export asset.[5] In his statutory notice respondent determined that the balance in the intercompany clearing account did not represent a qualified export asset. Respondent maintains that the debit balance in the account at the yearend reflects an excess of funds transferred to Machine above the transfer price or cost of goods sold. Respondent contends that although the debit balance in the account reflects an account receivable, the receivable cannot be a qualified export asset within the meaning of section 993(b) and (c).

Petitioners claim that the account balance represents a beneficial interest in Machine's export inventory to which they are entitled, and that therefore the account balance should be included in International's qualified export assets. Petitioners maintain that the course of operations between the two corporations and the status of orders and inventory

---

[4] See Appendix A for chart of distributions to Machine.

[5] The parties have stipulated to the following adjustments to the intercompany account for 1980 and 1981:

|  | 1/30/80 | 1/30/81 | 1/30/82 |
|---|---|---|---|
| Per return | $1,343,760 | $702,832 | $514,244 |
| IRS adjustment and cumulative agreed adjustments | (129,167) | (129,167) (169,895) | (129,167) (169,895) (144,312) |
| Intercompany account balance after agreed adjustments | 1,214,593 | 403,770 | 70,870 |

on hand at yearend and shortly thereafter establish that the account represents this beneficial interest.

## Course of Operations

Machine had business locations in Spring Park and Plymouth, Minnesota, during the years in issue. The Spring Park facility was used as its manufacturing plant, where fabrication took place and raw materials were stored. The Plymouth facility was used as Machine's assembly, packaging, warehouse, and shipment plant, and was sometimes referred to as Machine's distribution center.

Machine produced approximately 200 different models of 115 volt and 230 volt battery and industrial machines during the years in issue. The specific models were divided into approximately 10 "families" such as floor machines, vacuums, convertamatics, and automatic scrubbers. All of the 230 volt models, approximately 20 percent of the battery convertamatics, and 25 to 30 percent of the industrial machines, were produced for export.

The distribution center in Plymouth consisted of two rectangular-shaped buildings connected by a link, forming an "H."[6] All types of machines for both domestic and international markets were assembled in the building to the left of the link. After assembly was completed, machines were transmitted across the link to the other building which was and is the storage area of the distribution center. The storage area is divided by columns into storage bays which are 33 feet wide, each bay containing approximately 5,000 square feet of floor space.

The distribution center manager and his assistant determined where the finished products would be stored in the Plymouth facility. The 230 volt machines were always stored in the international product storage bays. These two bays were in the southern section of the right side of the storage area. The international storage bays were separated by a rigid wall from the domestic storage area. Battery and industrial machines, which could be sold in either the domestic or international market, were stored in two locations in the distribution center. Those which were to be

---

[6] A third building connected by another link has since been added to the facility.

sold in the domestic market were stored in the general warehouse portion of the storage area, and those which were to be sold in the export market were stored in the international storage bays.

The determination of which battery and industrial machines were to be stored in the international bays was made after an examination of the weekly order reports for international customers. The order reports stated, by product code and customer order, the total current outstanding orders. The staging ledger, showing the total number and type of battery and industrial machines stored in the general warehouse area and the number of machines stored in the international bays, was also reviewed, as were production schedules which stated the anticipated future production of battery and industrial machines. Whether a battery or industrial machine was assigned to the international storage area depended on the need for battery and industrial machines to fill open orders within the following 30 to 60 days.

When the number of battery and industrial machines to be stored in each area was determined, the staging ledger was updated to describe the machines to be staged for international shipment. The updated staging ledger was usually prepared on a Wednesday and would direct the storage of newly assembled machines and those in existing inventory for the coming week. This report would be given to the workmen responsible for moving the newly assembled machines or those in existing inventory at the distribution center to either the general warehouse area or the international storage area.

Between the weekly updates, no entries were made to the staging ledger to reflect battery and industrial machines which had been shipped. However, on occasions, as needed, the staging ledger would be updated to add machines placed in the international storage bays to meet new requirements between the weekly updates. The staging ledger accurately reflected the contents of the international bays as of the day of the weekly updates. Between updates, to determine the number of battery and industrial machines on hand, the computer shipping records were consulted and/or machines were physically counted.

Finished goods were stored, grouped by model number, in the international storage bays. Replacement parts were stored in the replacement storage area. Although orders staged for export customers were all stored in the international bays, the particular machines shipped to particular export customers were not selected until near the time of shipment. With the exception of letter of credit orders, there was no item-by-item assignment of a particular machine to a particular customer in advance of shipment. When a customer's order was gathered for shipment, machines were selected on a first-in, first-out basis.

Most of the export products were shipped overseas by ocean container. The number of containerized shipments each week varied. Small orders which did not require containerization were shipped daily.

Machine's production rate for all of its products during the years in issue was fairly constant, with some slight variances due to anticipated slow sales periods or periods where fewer employees were on hand due to vacations. Its production rate was determined primarily from past sales history, factoring in anticipated growth. The master production plan was set annually, but changes or movements took place in the interim depending upon circumstances that arose at the time. The goal of the company was to keep a running inventory that matched its upcoming need for orders from International. Ideally, production equaled demand, and inventory was rarely on hand for more than 2 to 3 months, the time used for advance staging of orders.

The periodic transfers of funds by the treasurer of the two corporations from International to Machine were recorded in the intercompany clearing account as discussed earlier. The amount of cash transferred was intended for use for anticipated production of export product; however no direct correlation between the amounts transferred and export production costs known or expected was ever made, either before or after the amounts were transferred. The funds were deposited in Machine's general bank accounts from which expenses of production for either export or domestic product could be paid.

## Status of Inventory and Orders

At the end of International's fiscal years in issue, the approximate cost of the finished products Machine had on hand from which export orders could be filled was as follows:

| Description | 1/31/80 | 1/31/81 |
|---|---|---|
| 230 volt machines, spares, and accessories | $469,276 | $270,459 |
| Luxemburg [7] | 192,724 | - - - |
| Battery/industrial machines | 352,012 | 110,219 |
| Totals | 1,014,012 | 380,678 |

No exact cost figures are available. Calculations based on computer-generated physical inventory runs as of December 31 were stipulated, and the January 31 amounts were estimated based on the expected rise in finished inventory between December 31 and January 31. The figures are an overall average and do not take into account the variance in profit percentage among items.

Machine's open export orders from International were as follows on the dates indicated:

| Description | Orders 1/31/80 | Cost[8] | Orders 1/31/81 | Cost |
|---|---|---|---|---|
| 230 volt machines, spares, and accessories | $290,975 | $151,716 | $544,188 | $309,931 |
| Battery/industrial machines | 733,995 | 412,315 | 994,098 | 581,444 |
| Totals | 1,024,970 | 564,031 | 1,538,286 | 891,375 |

### OPINION

Generally, a corporation that qualifies as a DISC is not taxable on its profits. A portion of the DISC's profits is taxed currently to the shareholders, and tax is deferred on the remaining portion of the profits until such profits are actually distributed to the shareholders or until the corporation ceases to qualify as a DISC.

---

[7]International leased a warehouse facility in Luxemburg during 1979 and 1980 in which some of its 230 volt battery and industrial equipment for sale to International's European customers was stored. Sometime in 1980, Machine formed a Luxemburg corporation to maintain the Luxemburg warehouse.

[8]The cost data is partly an estimation. International had open orders for some product models for which no specific cost data was available because no comparable product model was reflected in the Dec. 31 inventory. The cost for these produce models was calculated using an average "cost percentage."

In order to qualify as a DISC, a corporation must satisfy five conditions set forth in section 992(a)(1). The "qualified export assets" test of section 992(a)(1)(B) is the only condition disputed in this case. Designed to ensure that substantially all of a DISC's assets are devoted to exporting, this test provides that the adjusted basis of the qualified export assets of the corporation at the close of the taxable year must equal or exceed 95 percent of the sum of the adjusted basis of all assets of the corporation at the close of the taxable year. See H. Rept. 92-533 (1971), 1972-1 C.B. 498,529.

Respondent determined that International did not qualify as a DISC during the years in issue because the balance in the intercompany clearing account, reflecting an amount due International from Machine, did not fall within any of the nine categories of qualified export assets found in section 993(b). By including the receivable in International's nonqualified assets at the close of each of the years in issue, the adjusted basis of International's nonqualified assets exceeds 5 percent of the adjusted basis of all of its assets for fiscal years 1980 and 1981.

Petitioners contend that the balance in the intercompany account represents a qualified export asset. In the alternative, petitioners argue that the amount in the account represents a constructive distribution to Machine by International and should be omitted from International's assets at the end of each of the years in issue.

In support of their primary contention petitioners claim that the balance in the intercompany account represents payment by International for inventory and prepayment for export property.[9] Petitioners claim that the course of dealing between the two corporations establishes that International had a "beneficial interest" in Machine's property to the extent of the account balance at the end of each

---

[9]"Export property" is one category of qualified export assets. Sec. 993(b)(1) and 993(c).
"Export property" is defined in sec. 993(c)(1):

(1) IN GENERAL.—For purposes of this part, the term "export property" means property—
  (A) manufactured, produced, grown, or extracted in the United States by a person other than a DISC,
  (B) held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a DISC, for direct use, consumption, or disposition outside the United States, and
  (C) not more than 50 percent of the fair market value of which is attributable to articles imported into the United States.

year, and that because the property to which the beneficial interest relates would qualify as export property, they should be entitled to treat the balance in the account as export property.

Petitioners rely on our decisions in *Goldberger, Inc. v. Commissioner,* 88 T.C. 1532 (1987), and *Expo-Chem, Inc. v. Commissioner,* T.C. Memo. 1983-212, both of which address the characterization of advance payments as qualified export assets. In *Goldberger,* we addressed the issue of whether a wholly owned subsidiary qualified as a DISC. The subsidiary was involved in selling meat overseas, primarily to Japan. During the year in issue the subsidiary had assets worth $100,946, of which $81,354 represented advances to its parent. The advances were to be used to purchase merchandise to be sold by the subsidiary. The subsidiary did not have any credit in its own name, but the parent had a line of credit with a supplier. However, when the supplier discontinued supplying beef to the subsidiary, the owner of the two businesses was unable to replace the source of supply. The advanced funds were not, as had been expected, used to purchase export product and were not repaid within the following year.

The taxpayer argued that the advances were export property within the meaning of sections 993(b)(1) and 993(c), or in the alternative, were qualified export assets under section 993(b)(4).[10] We held that the advances did not come within the definition of section 993(c)(1)(B) because no inventory was purchased with the advances and therefore no property was held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a DISC, for direct use, consumption, or disposition outside the United States. We also held that the advances were not temporary investments under section 993(b)(4) because the DISC and its parent were members of a controlled group.

---

[10]SEC. 993. DEFINITIONS.

(b) QUALIFIED EXPORT ASSETS.—For purposes of this part, the qualified export assets of a corporation are—

* * * * * * *

(4) money, bank deposits, and other similar temporary investments, which are reasonably necessary to meet the working capital requirements of such corporation.

*Expo-Chem* also involved a DISC that had made advance payments for the purchase of inventory. The taxpayer argued that the advance payments qualified as export assets under section 993(b)(4). We held that the advances did not fall within that section or any other category under section 993(b) because the inventory that was purchased with the funds was ultimately sold domestically, and the funds were returned to the DISC. In footnote 9 of that opinion however we stated:

> Expo's controller testified that the advance to Miljac "was categorized as a prepayment for the material that we might be buying from suppliers." Under other circumstances, such prepayment might constitute the acquisition of inventory under section 993(b)(1) and 993(c). The facts found here, however, do not justify such a categorization.
>
> In considering the evidence, we note that a statutory notice of deficiency is ordinarily presumed correct, and the taxpayer bears the burden of persuasion (the ultimate burden) and the burden of going forward with the evidence. * * * In determining whether a corporate-petitioner has satisfied the burden of proof, dealings between it and related corporations are subjected to particularly close scrutiny. * * *
>
> [*Expo-Chem, Inc. v. Commissioner,* T.C. Memo. 1983-212 (52 P-H Memo T.C. par. 83,212 at 83-876 n. 9, 45 T.C.M. 1351, 1355 n. 9.) Citations omitted.]

Petitioners argue that the "other circumstances" referred to in footnote 9 are present here: that export products representing assets of International for foreign sale were actually in existence at International's yearend and that International actually sold export products shortly after the close of each tax year in excess of the amount of the year-end balances in the intercompany account. On this basis, petitioners contend that the amount in the intercompany account should be treated as prepayment for export products, and following the suggestion in footnote 9, should be considered as qualified export property.

Respondent argues that the account balance does not represent export property, but instead represents a nonqualified "receivable" of Machine to International arising from previous intercompany transfers of funds to Machine in excess of the transfer price due from International to Machine under section 1.994-1(c), Income Tax Regs. Respondent maintains further that the account balance cannot represent export property because no title to

Machine's inventory has passed. The advances, respondent argues, cannot be considered qualified export property until title passes to the inventory. Moreover, respondent argues, to permit International to make unrestricted payments to Machine and include the balance due from Machine as an export asset would circumvent the purpose behind the specific requirements of producer's loans found in section 993(d).[11]

We have considered both parties' arguments. In light of the fact that open orders existed at the end of the fiscal year and new orders were filled in the subsequent months which exceeded the balance in the account at yearend, petitioners' argument is appealing. Moreover, the cash transfers between Machine and International appear to be tied to Machine's needs for production of export product, and the funds transferred may have been used for the production of export products that were purchased and sold by International. At least we have no evidence to the contrary. However, we are not persuaded that this course of dealing between the two corporations establishes that the amount in the intercompany account was intended to be, or in fact represents, prepayment for export products or payment for inventory. We cannot overlook the fact that the payments to Machine were made independently of orders for export product and there were no restrictions on Machine's use of the funds once they were received. Furthermore, no efforts were ever made to correlate the payments with orders for inventory or to designate the transfers as payments for inventory.

The inability to trace the transfers of funds to inventory or orders for inventory is a critical distinction between this

---

[11]SEC. 993. DEFINITIONS.

(d) PRODUCER'S LOANS.—

(1) IN GENERAL.—An obligation, subject to the rules provided in paragraphs (2) and (3), shall be treated as arising out of a producer's loan if—

(A) the loan, when added to the unpaid balance of all other producer's loans made by the DISC, does not exceed the accumulated DISC income at the beginning of the month in which the loan is made;

(B) the obligation is evidenced by a note (or other evidence of indebtedness) with a stated maturity date not more than 5 years from the date of the loan;

(C) the loan is made to a person engaged in the United States in the manufacturing, production, growing, or extraction of export property determined without regard to subparagraph (C) or (D) of subsection (c)(2), (referred to hereinafter as the "borrower"); and

(D) at the time of such loan it is designated as a producer's loan.

case and *Goldberger* and *Expo-Chem*. In those cases, the question of whether the advance payments were intended for or were for the acquisition of inventory was not raised. The issues instead were whether the prepayments qualified as export assets when either no property was in fact purchased and the advances were not returned (*Goldberger*), or when the property was purchased but was in fact sold domestically (*Expo-Chem*). Our comment in footnote 9 of *Expo-Chem* addressed whether prepayments or advances would be characterized as export property if property purchased with the payments had been exported rather than sold domestically. We were not faced with the fact situation we have here where advances were not tied to any specific orders, but instead were made, without restriction of use, purportedly on the basis of Machine's anticipated costs of production.

Even though in this case International purchased Machine's export product and was Machine's sole international distributor, these circumstances do not obviate the need for International to account for its payments to Machine and relate those payments to specific purchases of or orders for inventory. Without this evidence and without any further confirmation that the funds were restricted in some manner to export production,[12] we do not even reach the issue of whether, if the advances were prepayments, those payments would be considered export property for purposes of the qualified export assets test.[13]

---

[12]Petitioners were unable to substantiate their general assertion that the cash transfers to Machine were proportionate to Machine's requirements for export production.

[13]The parties argued at length about whether International's "expectation" was sufficient to give it an interest in the property such that the interest could be considered export property within the meaning of secs. 993(b)(1) and 993(c). Respondent contends that under the circumstances of this case title to the inventory never passed to International and that therefore International cannot satisfy the requirement that the property be held for sale in the ordinary course of business under sec. 993(c)(2). Respondent also argues that International could not acquire basis in the property absent title passage and that the 95-percent test of sec. 992(a)(1)(B) refers to the DISC's adjusted basis in its property, making ownership of property a prerequisite to inclusion in the equation. Petitioners contend that title passage is not a prerequisite because the course of dealing between the corporations would give International an interest in the property under the provisions of the Uniform Commercial Code.

Having determined that the advance payments must be tied to specific inventory or specific orders for inventory before we will even consider whether a prepayment or advance for inventory is export property, we do not reach the issue of whether title to such inventory must pass before a DISC can include the advance payments in its export property. We note in this respect, however, that petitioner did not argue that the inventory in the Luxemburg warehouse as of Jan. 31, 1980, should be treated any differently from the inventory in the Plymouth facility. See note 7 *supra*. The Luxemburg inventory was apparently under

In effect, petitioners urge us to ignore the implication of permitting unrestricted transfers of funds between a DISC and its parent or supplier because it appears that Machine committed the funds from this or other sources or both to production of export product. Upon review of the DISC provisions and their legislative history, we do not sanction such unrestricted transfers of funds. To allow International to categorize the payments as export property in the absence of some evidence that the payments were related to purchases of or orders for inventory would, as respondent correctly points out, permit petitioners to circumvent the express restrictions imposed by Congress on transfers of funds between a DISC and its parent or supplier. When the DISC provisions were enacted, Congress expressed concern that a DISC's untaxed profits be committed to its exporting activities. Realizing that tracing the use of the funds would be complicated and fruitless, Congress chose, instead, to enact specific limitations on the use of the untaxed profits. The following colloquy evidences the concern and solutions proposed:

Senator Nelson. * * * [to Secretary Connally] I would like to ask you about that part of your statement, Mr. Secretary, in which you say:

The income from export sales which receives the deferral treatment must be used either to increase the export sales activities of the DISC or it may be lent to the U.S. producer, usually the parent company, to finance increases in inventories, machinery and equipment and the other fixed assets or research and development expenditures.

On that point, Professor Surrey states:

The Treasury stresses that the profits of a DISC, freed from taxes, will be used to promote export activities. But the tax experts who study the technical details know that these tax-free funds can be used for activities that have nothing to do with exports. Thus the funds can be used by large manufacturing companies, who are presently exporters, for purely domestic activities where the favored companies are able to compete with tax-free DISC money against companies not so favored.

They can be used even to build manufacturing plants abroad and thus reduce the export trade of the United States. The DISC money is simply

International's control even though it was accounted for on Machine's books as Machine's inventory. Although petitioners did not argue so, it appears that on this basis the inventory may have been includable in International's assets. Without further evidence or argument, however, we do not reach this issue, the result of which would not change our holding with respect to International's qualification as a DISC.

made available to the companies and the Treasury will ask no questions on how it is used.

Would you like to comment on that, Mr. Secretary:

Secretary Connally. Senator, if you will permit it, I would prefer that Mr. Nolan comment on it for a number of reasons. * * *

Mr. Nolan. Senator, the thrust of Professor Surrey's comments is that if we are to have the DISC proposal we should have a rule which traces the use of the tax benefits that are available to the DISC into some particular form of investment.

We have been generally unsuccessful, however, over a long period of years in applying rules which try to trace dollars to specific kinds of investments. What we have tried to do in the DISC proposal therefore is to set up a carefully limited system so that the DISC tax benefits can only be effectively used for certain purposes which we think basically confine them to export-related functions without actually tracing dollars.

In the first place, the moneys retained by the DISC can only be used by it in one of two ways; first, by the DISC to increase its own export activities because if it accumulates dollars itself for other purposes then it loses its qualification as a DISC.

The second way is to use moneys to make loans to domestic producers of export property. If the money is loaned back under the producer loan rules for example, to a DISC's parent company those loans will qualify only if the parent increases its investment in the year in which the loan is made in fixed assets, R. & D. expenses, or inventories and we have limited the extent to which these parent company loans can be made to that proportion of the parent company's investment in those categories of assets which its export sales bear to its total sales—in other words, that portion of the producer's total assets which may reasonably be deemed to be related to its export productions.

Now, it is true that we do not attempt to trace the dollars into particular export-related investments, we have, however, imposed the limitation which I just described.

Any U.S. manufacturer has funds coming in to it from a variety of sources—from its current income, from its borrowings, from all sorts of sources—and it is simply not practical to say that this dollar went into this particular investment or that one went into another.

The important thing is to limit the extent to which the DISC profits can be used by the parent company, and we have limited the loans to producers to the proportion of the total investment in these kinds of manufacturing assets which the producer's export sales bear to its total sales, and we have required that there be an investment by the borrower in its U.S. assets in the amount of the borrowed funds in the year the loan is made.

[Hearings on H.R. 10947 before the Senate Comm. on Finance, 92d Cong., 1st Sess. 17-18 (1971); and see also Statement of Stanley S. Surrey at 733-734.]

It is apparent that Congress sought to limit a DISC's use of its untaxed earnings to increasing its export activities or to making the specific type of loans set forth in the producer's loan provisions, neither of which is the case we have before us.

Petitioners' additional argument that we should relax the requirements for DISC qualification because the DISC provisions were added to encourage export activities does not persuade us otherwise. We recognize that a DISC in operation over a period of several years inevitably accumulates untaxed earnings and faces a problem meeting the 95-percent qualified export assets tests. See, e.g., Green, "How DISCs Meet the Assets Test," 5 International Tax J. 357 (1979); Norman, "The Use of Producer's Loans to Increase DISC Benefits," 1 International Tax J. 201, 212 (1975). However, we cannot sanction a use of those earnings that has not been authorized by Congress. The emphasis on relaxed standards for corporate substance does not carry over to the other DISC qualification provisions. See, e.g., *Goldberger, Inc. v. Commissioner,* 88 T.C. 1532, 1547-1549 (1987); *CWT Farms, Inc. v. Commissioner,* 79 T.C. 86, supplemental opinion 79 T.C. 1054 (1982), affd. 755 F.2d 790 (11th Cir. 1985). On the facts before us the intercompany debit balance in the account does not represent a qualified export asset, but instead represents amounts transferred to Machine in excess of cost of goods sold and related adjustments to transfer price.

In light of this result, we must determine how the intercompany account balance should be treated. Respondent maintains that the balance is simply a receivable on International's books that is a nonqualified asset. Petitioners claim that if the account balance does not qualify as an export asset, the amounts paid to Machine in excess of cost of goods sold and adjustments to the transfer price for the years in issue should be treated as constructive distributions.

On the record before us we agree substantially with petitioners. Both parties admit that the amounts transferred to Machine did not constitute a loan; there is no evidence that Machine intended to repay the excess amounts transferred, in cash or inventory. On these facts

we can conclude only that the amounts transferred by International to Machine during each year in issue in excess of cost of goods sold and adjustments to transfer price were actual (not constructive) distributions of International's earnings. See and compare *Pierce v. Commissioner*, 61 T.C. 424, 430-432 (1974); *Haber v. Commissioner*, 52 T.C. 255, 266-268 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970). The amounts therefore, are not to be included in International's assets, qualified or nonqualified, for purposes of determining whether the 95-percent qualified export asset test has been satisfied, but should instead be treated as actual distributions[14] to Machine during each of its taxable years 1979, 1980, and 1981.[15] On the basis of the foregoing,

*Decision will be entered under Rule 155.*

---

APPENDIX A

Distributions From International to Machine

Fiscal year ended January 31, 1980

| February 1979 | March 1979 | April 1979 | May 1979 | June 1979 | July 1979 |
|---|---|---|---|---|---|
| $65,000 | $100,000 | $80,000 | $50,000 | $75,000 | $100,000 |
| 75,000 | 50,000 | 25,000 | 25,000 | 50,000 | 50,000 |
| 60,000 | 25,000 | 75,000 | 25,000 | 50,000 | 100,000 |
| 60,000 | 100,000 | 25,000 | 50,000 | 25,000 | 100,000 |
| 75,000 | 75,000 | 50,000 | 100,000 | 50,000 | 100,000 |
| 75,000 | 100,000 | 100,000 | 150,000 | 100,000 | 100,000 |
| 150,000 | 85,000 | 100,000 | 25,000 | 50,000 | 550,000 |
| 50,000 | 50,000 | 100,000 | 100,000 | 50,000 | |
| 100,000 | 40,000 | 555,000 | 100,000 | 75,000 | |
| 710,000 | 70,000 | | 100,000 | 100,000 | |
| | 695,000 | | 75,000 | 75,000 | |
| | | | 700,000 | 100,000 | |
| | | | | 75,000 | |
| | | | | 100,000 | |
| | | | | 75,000 | |
| | | | | 875,000 | |

[14]See sec. 996 for the rules for allocating distributions to previously taxed income, accumulated DISC income, and/or other earnings and profits.

[15]Although the parties stipulated that International qualified as a DISC for its fiscal year ended Jan. 31, 1982, the stipulation does not affect our holding that the debit balance in the intercompany account represents actual distributions to Machine during each of Machine's years in issue.

462

| August 1979 | September 1979 | October 1979 | November 1979 | December 1979 | January 1980 |
|---|---|---|---|---|---|
| $150,000 | $50,000 | $50,000 | $100,000 | $100,000 | $25,000 |
| 100,000 | 50,000 | 50,000 | 200,000 | 50,000 | 25,000 |
| 100,000 | 100,000 | 100,000 | 100,000 | 125,000 | 50,000 |
| 100,000 | 100,000 | 100,000 | 100,000 | 150,000 | 50,000 |
| 100,000 | 100,000 | 100,000 | 200,000 | 100,000 | 50,000 |
| 100,000 | 100,000 | 50,000 | 75,000 | 100,000 | 200,000 |
| 100,000 | 500,000 | 25,000 | 50,000 | 100,000 | 50,000 |
| 750,000 | | 100,000 | 825,000 | 100,000 | 100,000 |
| | | 575,000 | | 100,000 | 25,000 |
| | | | | 50,000 | ·50,000 |
| | | | | 975,000 | 100,000 |
| | | | | | 725,000 |

## Fiscal year ended January 31, 1981

| February 1980 | March 1980 | April 1980 | May 1980 | June 1980 | July 1980 |
|---|---|---|---|---|---|
| 100,000 | $50,000 | $50,000 | $25,000 | $50,000 | $100,000 |
| 175,000 | 150,000 | 50,000 | 100,000 | 100,000 | 100,000 |
| 100,000 | 50,000 | 150,000 | 25,000 | 50,000 | 100,000 |
| 100,000 | 100,000 | 50,000 | 100,000 | 50,000 | 25,000 |
| 75,000 | 200,000 | 50,000 | 25,000 | 25,000 | 100,000 |
| 150,000 | 50,000 | 50,000 | 50,000 | 100,000 | 100,000 |
| 100,000 | 100,000 | 100,000 | 50,000 | 25,000 | 50,000 |
| 800,000 | 75,000 | 100,000 | 100,000 | 25,000 | 575,000 |
| | 100,000 | 75,000 | 50,000 | 25,000 | |
| | 50,000 | 25,000 | 100,000 | 100,000 | |
| | 925,000 | 50,000 | 625,000 | 550,000 | |
| | | 750,000 | | | |

| August 1980 | September 1980 | October 1980 | November 1980 | December 1980 | January 1981 |
|---|---|---|---|---|---|
| $25,000 | $200,000 | $75,000 | $100,000 | $100,000 | $250,000 |
| 150,000 | 200,000 | 25,000 | 50,000 | 50,000 | 50,000 |
| 100,000 | 50,000 | 75,000 | 25,000 | 50,000 | 50,000 |
| 25,000 | 100,000 | 75,000 | 25,000 | 50,000 | 100,000 |
| 100,000 | 100,000 | 75,000 | 25,000 | 50,000 | 100,000 |
| ·200,000 | 50,000 | 50,000 | 15,000 | 50,000 | 550,000 |
| 50,000 | 700,000 | 100,000 | 240,000 | 50,000 | |
| 100,000 | | 100,000 | | 100,000 | |
| 100,000 | | 25,000 | | 75,000 | |
| 100,000 | | 600,000 | | 50,000 | |
| 100,000 | | | | 50,000 | |
| 100,000 | | | | 25,000 | |
| 50,000 | | | | 75,000 | |
| 1,200,000 | | | | 775,000 | |