*CWT FARMS, INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT*

CWT INTERNATIONAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16365–80, 16367–80.     Filed July 19, 1982.

---

* Supplemental Opinion appears at 79 T.C. 1054 (1982).

*W. Woodrow Stewart, T. Treadwell Syfan,* and *Steven A. Cornelison,* for the petitioners.
*Bettie N. Ricca,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Petitioner | Year ended | Deficiency |
|---|---|---|
| CWT Farms, Inc ................. | 9/30/75 | $173.91 |
| | 9/30/76 | 24,624.41 |
| | 9/30/77 | 28,965.84 |
| CWT International, Inc ........ | 9/30/75 | 37,634.40 |
| | 9/30/76 | 34,675.38 |
| | 9/30/77 | 26,067.37 |

The ultimate issue for decision is whether CWT International, Inc. (International), qualified as a domestic international sales corporation (DISC) for its taxable years ending in 1975, 1976, and 1977. Here, we resolve that issue by deciding whether certain loans made by International to its parent corporation, CWT Farms, Inc. (Farms), and evidenced by demand notes constituted producer's loans within the meaning of section 993(d)(1)(B), I.R.C. 1954.[1] If International did not qualify as a DISC for any of such years, we must also decide whether Farms is entitled to the dividends received deduction of section 243 for the accumulated DISC income of International deemed distributed to Farms under section 995(b)(2).

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Farms and International, were both Georgia corporations with their principal places of business in Gainesville, Ga., at the time they filed their petitions in this case. International was organized on September 7, 1972. At such time, and during the years in issue, it had only one class

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

of stock, which had an aggregate par value of $2,500 on each day of such years. Farms was the sole shareholder of such stock. On September 7, 1972, International timely and properly filed its election to be treated as a DISC, and the election was consented to by Farms. Both Farms and International use a taxable year ending September 30, and we shall identify the taxable year of each such corporation by the calendar year in which it ends. International and Farms filed Federal corporate income tax returns for their taxable years 1975, 1976, and 1977 with the Internal Revenue Service Center, Chamblee, Ga.

During the period September 30, 1974, through September 19, 1976, Farms was a wholly owned subsidiary of Twin Oaks Hatchery, Inc. (Twin Oaks). During the period September 20, 1976, through September 30, 1977, the stock ownership of Farms was as follows:

| Shareholder | Number of shares |
|---|---|
| Twin Oaks | 40 |
| Raymond H. Burch | 10 ½ |
| Joseph C. White | 5 |

During the years in issue, Helen Feed Store, Inc. (Helen Feed), was a wholly owned subsidiary of Twin Oaks.

During the years in issue, Farms was engaged in the domestic production of poultry products and in the domestic sale and foreign export of such products. International was a "paper corporation." Its sole function was to act, pursuant to a sales franchise agreement, as commission agent for items exported by Farms. During the years in issue, the officers of both such corporations were the same.

During the years in issue, both Farms and International kept their books and records under the accrual method of accounting. Thus, the commissions due to International became fixed as of the end of the taxable year of each corporation. However, Farms did not receive from its accountant the information from which it could determine the amount of such commissions until approximately 1 week prior to the time for filing the Federal corporate income tax returns for Farms and International. During the years in issue, International received the following commissions from Farms:

| Year | Amount | Date paid |
|---|---|---|
| 9/30/75 | $157,538.33 | 12/15/75 |
| 9/30/76 | 145,440.77 | 12/ 8/76 |
| 9/30/77 | 116,142.53 | 12/20/77 |

International made the following loans to Farms: On December 15, 1974, $66,873.22; on December 15, 1975, $79,134.16; and on December 15, 1976, $72,000. Each of such loans was evidenced by a demand promissory note. None of such notes stated on its face that it was a producer's loan within the meaning of section 993(d)(1), nor was there any language on the face of such note stating that the loan was a producer's loan. However, the books and records of International showed each of such loans under an account labeled "Producers Loans." Also, the amounts of such loans were reflected on Schedule L of Form 1120-DISC filed by International for each of the taxable years in which such loans were made.

The note of December 15, 1974, was renewed on December 1, 1979, with a fixed and stated maturity date of December 1, 1984. The note of December 15, 1975, was renewed on December 1, 1980, with a fixed and stated maturity date of December 1, 1985. The note of December 15, 1976, was renewed on September 1, 1981, with a fixed and stated maturity date of August 31, 1986. The renewal notes of December 1, 1979, and September 1, 1981, stated on their face that they were producer's loans.

In determining the amounts that International could loan to Farms as producer's loans, Farms aggregated its export-related assets with the export-related assets of Helen Feed and Twin Oaks.[2] In 1976, Twin Oaks spent $98,377.44 in connection with its ISA Vedette flocks and treated such expenditure as a research and experimental expenditure within the meaning of section 174. Farms did not file written statements to aggregate the export-related assets of its controlled group with International's Federal income tax returns for the taxable years 1975, 1976, and 1977. However, in November 1978, such statements were submitted to the revenue agent

---

[2]International, Farms, Helen Feed, and Twin Oaks constituted a controlled group within the meaning of sec. 993(a)(3).

examining the returns of the corporation. Prior to submitting such statements, Farms was unaware that the regulations under section 993(d) required such a written election to aggregate the export-related assets of its controlled group.

In his notice of deficiency to International, the Commissioner determined that it did not qualify as a DISC for its taxable years 1975, 1976, and 1977, and that the full amount of its income was taxable for those years. In his notice of deficiency to Farms, the Commissioner determined that as a result of the disqualification of International for its taxable years ending after 1974, International's accumulated DISC income (as described in section 995(b)(2)(A)), as of September 30, 1974, was taxable to Farms for each of its taxable years 1976 and 1977. Also, the Commissioner disallowed certain country club dues paid by Farms.

OPINION

In connection with the enactment of the DISC legislation, Congress explained the reasons for such legislation:

your committee believes that it is important to provide tax incentives for U.S. firms to increase their exports. This is important not only because of its stimulative effect but also to remove a present disadvantage of U.S. companies engaged in export activities through domestic corporations. Presently, they are treated less favorably than those which manufacture abroad through the use of foreign subsidiary corporations. United States corporations engaging in export activities are taxed currently on their foreign earnings at the full U.S. corporate income tax rate regardless of whether these earnings are kept abroad or repatriated. In contrast, U.S. corporations which produce and sell abroad through foreign subsidiaries generally can postpone payment of U.S. tax on these foreign earnings so long as they are kept abroad. [H. Rept. 92–533 (1971), 1972–1 C.B. 498, 529.]

In general, a corporation which qualifies as a DISC is not taxable on its profits. However, the shareholders are taxable currently on a portion of such profits, and they may defer taxation on the remaining portion of the profits until the profits are actually withdrawn from the DISC or until the corporation ceases to qualify as a DISC. The first issue for

decision is whether International qualified as a DISC for its taxable years 1975, 1976, and 1977.[3]

One of the requirements for qualification as a DISC is that at least 95 percent of the assets of the corporation at the close of its taxable year must be "qualified export assets." Sec. 992(a)(1)(B). Such test is designed to ensure that substantially all of the DISC's assets are devoted to exporting. H. Rept. 92–533, *supra*, 1972–1 C.B. at 529. A DISC may operate on the basis of receiving commissions for the sales of products produced in the United States, usually by its parent, and the commissions due to the DISC for such sales may constitute qualified export assets for purposes of satisfying the 95-percent test. In addition, a DISC, if certain limitations are satisfied, is permitted to loan its tax-deferred profits (termed accumulated DISC income) to a U.S. manufacturing company (usually the parent of the DISC). See sec. 993(d)(1)(C). Such loans (termed "producer's loans") also constitute qualified export assets of the DISC for purposes of satisfying the 95-percent test. Sec. 993(b)(5).

In order to qualify as a producer's loan, the loan must be designated as a producer's loan at the time it is made and must be evidenced by a note (or some other evidence of indebtedness) which must have a stated maturity date of not more than 5 years. Sec. 993(d)(1)(B), (D). A limitation is placed on the amount of accumulated DISC income which may be loaned to any one borrower. In general, such limitation is based on the amount of the borrower's assets which are treated as export related. Whether a loan is within the borrower's limitation is tested, at the time the loan is made, by adding the amount of the loan to the unpaid balance of all other producer's loans of the borrower outstanding at that time and comparing such amount to the borrower's limitation. See sec. 993(d)(2). To the extent a loan exceeds the borrower's limitation, it is not considered a producer's loan and therefore is not a qualified export asset of the lending DISC for purposes of satisfying the 95-percent test. Also, a loan can qualify as a producer's loan only to the extent that the DISC is able to show that during the year in which the loan was made the borrower increased

[3]Neither in its petition nor on brief has Farms raised the issue of the country club dues disallowed by the Commissioner. Therefore, we consider such issue to have been conceded.

its investment in inventory, plant, machinery, and equipment, or increased its research and experimental expenditures (within the meaning of section 174), in the United States for that year by an amount equal to the amount of the loan. See sec. 993(d)(3). For purposes of these limitations, a borrower which is a member of a controlled group may, at the election of the borrower, aggregate the export sales and export-related assets of its controlled group (other than a member of the group which is a DISC).

The Commissioner maintains that International failed to satisfy a variety of these complex requirements: particularly, he contends that its qualified export assets at the close of each of the years at issue did not equal or exceed 95 percent of its assets as required by section 992(a)(1)(B). In support of his argument, the Commissioner raises several points: First, that the commissions receivable owed by Farms to International were not qualified export assets since such commissions were not paid within 60 days after the taxable year as required by sections 1.993–2(d)(2) and 1.994–1(e)(3), Income Tax Regs.; second, that the loans by International to Farms did not qualify as producer's loans since the notes did not bear a legend identifying them as producer's loans as required by section 1.993–4(a)(1)(iv), Income Tax Regs.; and third, that such loans were not producer's loans since the notes failed to contain a stated maturity date not more than 5 years from the date of the loan, as required by section 993(d)(1)(B).

Moreover, even if such loans otherwise qualify as producer's loans, the Commissioner argues that they exceeded the limitation of section 993(d)(2) and that the increased investment requirement of section 993(d)(3) was not satisfied. In support of such argument, the Commissioner contends that Farms did not properly elect to aggregate the export-related assets of its controlled group, as required by section 1.993–4(a)(2)(vii), Income Tax Regs.; therefore, he contends that the determination of whether the requirements of section 993(d)(2) and (3) were met must be measured by looking only to Farms, and that as so measured, such requirements were not met. Also, he contends that the expenses incurred by Twin Oaks in connection with its ISA Vedette flocks did not constitute research and experimental expenditures within the meaning of section 174.

In rebuttal, the petitioners challenge the validity of the Commissioner's regulations; most vehemently, they argue that the Commissioner acted arbitrarily in making such regulations retroactively applicable to them. They also contend that the submission of the election to the revenue agent represented substantial compliance with the requirement of the law, that the expenditures for the ISA Vedette flocks were research and experimental expenditures within the meaning of section 174, and that the demand notes satisfied the requirements of the statute. Fortunately, we need not adjudicate all these controversies at this time. The parties agree that for International to qualify as a DISC, it must satisfy all the requirements at issue, and since we have concluded that the demand notes given by Farms did not satisfy the statutory requirement, we need not and do not pass on the other matters at issue.

Specifically, section 993(d)(1) provides, in part, that an obligation shall be treated as arising out of a producer's loan if:

(B) the obligation is *evidenced by a note* (or other evidence of indebtedness) *with a stated maturity date* not more than 5 years from the date of the loan; [Emphasis added.]

The parties have stipulated that the original notes given by Farms were payable on demand. The petitioners argue that since such notes were due immediately, they had a stated maturity date—namely, the date of their execution. Therefore, they contend that a demand note, if it is paid or properly renewed within 5 years of the date of its execution, satisfies the requirement of section 993(d)(1)(B). Moreover, they contend that they did not violate the spirit of the statute, since all of such notes were properly paid by renewal within 5 years of the date of their execution and since each of the renewal notes contained a fixed maturity date of not more than 5 years from the date of renewal. Finally, they argue that at the time of the renewals, the new notes met all the statutory requirements.

Webster's Third New International Dictionary defines "stated" as "set or fixed," "set down explicitly." Such term has no technical significance under the tax laws; nowhere in the Internal Revenue Code is such term defined. Thus, the rules of statutory construction require us to interpret such term by giving it the meaning commonly attributable to it. *Anderson v. Commissioner*, 67 T.C. 522, 560–561 (1976), affd. per curiam 583 F.2d 953 (7th Cir. 1978). The plain meaning of section

993(d)(1)(B) is that a producer's loan must be evidenced by a time note, not a demand note, with a fixed maturity date of not more than 5 years. However, we need not rest our holding on a literal interpretation of the statute; the legislative history provides additional indications that Congress did not intend that a demand note would satisfy the requirement of section 993(d)(1)(B).

The DISC provisions, including section 993(d), were added to the Code by section 501 of the Revenue Act of 1971, Pub. L. 92–178, 85 Stat. 535–549. The House report accompanying such act, H. Rept. 92–533, *supra*, 1972–1 C.B. at 535, mirrors the language of section 993(d)(1)(B) that a producer's loan must be evidenced by a note which has a stated maturity date of not more than 5 years. Such report goes on to state that:

If a loan * * * is not collected by the DISC when it matures or is extended at maturity *for a period which does not have a fixed time limit,* the loan is to cease to qualify as a producer's loan at its original maturity. [H. Rept. 92–533, *supra*, 1972–1 C.B. at 535; emphasis added.]

The Senate report accompanying such act, S. Rept. 92–437 (1971), 1972–1 C.B. 559, 616, likewise provides that a producer's loan must be evidenced by a note which has a stated maturity date of not more than 5 years, and that if a loan which qualifies as a producer's loan is extended at maturity for "a period which does not have a fixed time limit, the loan is to cease to qualify as a producer's loan at its original maturity." S. Rept. 92–437, *supra*, 1972–1 C.B. at 616. Also, such report further states that "If a loan which qualifies as a producer's loan is not collected by the DISC when it matures, it must requalify as a producer's loan as of the maturity date." 1972–1 C.B. at 616. The substance of such language from the House and Senate reports is embodied in section 1.993–4(a)(2)(v), (a)(4), Income Tax Regs.

It is clear from the committee reports and section 1.993–4(a)(4) of the regulations that the renewal of a note, which originally qualified as a producer's loan, by a note which does not have a "fixed time limit," i.e., a demand note, will cause the loan to be disqualified as of such renewal date. Thus, if a demand note would not satisfy the requirements for the renewal of a producer's loan, it clearly follows that a loan originally evidenced by a demand note would not satisfy the

statutory requirements. See R. Feinschreiber, Domestic International Sales Corporations 127 (1978).

Moreover, when a loan which originally qualified as a producer's loan is renewed, extended, or refinanced, it must, at such time, meet all the conditions to qualify as a producer's loan for the purposes of satisfying section 993(d)(2) and (3). S. Rept. 92-437, *supra*; sec. 1.993-4(a)(2)(v), (a)(4), Income Tax Regs. Also, section 1.993-4(a)(4) provides that "If a producer's loan is not paid in full at its maturity date and is not formally refinanced, renewed, or extended, such loan shall be deemed to be a new loan which does not have a stated maturity date and, thus, will not be a producer's loan."

The petitioners assume that the determination of whether the renewal of the demand notes satisified the requirements of section 993(d)(2) and (3) is to be made on the date the petitioners chose to renew such loans, since such renewal was made within 5 years of the date the demand notes were executed. However, payment of a demand note can be required immediately on its execution. Hence, each day the lender does not call such loan, there is an implied and informal renewal or extension; that is, each day such loan is outstanding, it is deemed to be a new loan. As such, for the purposes of meeting the requirements of section 993(d)(3), all of the loans outstanding which are evidenced by demand notes, and not solely the additional loan made in a taxable year, must be aggregated as of the end of the borrower's taxable year, since all of such loans are deemed to be new loans. Sec. 1.993-4(a)(2)(v), (a)(4), (c)(1), Income Tax Regs. It is clear from the record that as so aggregated, the loans from International to Farms exceeded the increased investment requirement of section 993(d)(3). Also, since there was no *formal* refinancing, renewal, or extension of the loans evidenced by demand notes, such loans, unless paid immediately, ceased to qualify as producer's loans on the day following the date the notes were executed. Sec. 1.993-4(a)(4), Income Tax Regs. For all these reasons, we hold that when International accepted the demand notes as evidence of its loans to Farms, such loans did not qualify as producer's loans within the meaning of section 993(d) and that, therefore, International did not qualify as a DISC for any of the years at issue.

Having reached that conclusion, the final issue for decision

is whether Farms is entitled to the dividends received deduction of section 243 for the accumulated DISC income of International deemed distributed to it in 1976 and 1977 pursuant to section 995(b)(2). Section 1.246–4, Income Tax Regs., was proposed on January 5, 1973 (38 Fed. Reg. 883), and was adopted on August 2, 1973, by T.D. 7283, 1973–2 C.B. 79–80. Such regulations provide that the dividends received deduction of section 243 is not allowable with respect to any dividend, *whether in the form of a deemed or actual distribution*, from a corporation which is a DISC, or a former DISC, to the extent such dividend is from such corporation's accumulated DISC income, or previously taxed income, or is a deemed distribution pursuant to section 995(b)(1). Section 1.995–1(a)(5), Income Tax Regs., was proposed on December 29, 1972 (37 Fed. Reg. 28754), and was adopted on September 27, 1974, by T.D. 7324, 1974–2 C.B. 240–243. Such regulations provide that since a DISC is not taxed on its taxable income, the deduction otherwise allowed under section 243 is not allowed for a dividend from a DISC, or a former DISC, *which is paid or treated as paid out of* accumulated DISC income, or previously taxed income, or is a deemed distribution in a qualified year under section 995(b)(1) and section 1.995–2(a), Income Tax Regs. Thus, under such regulations, Farms is not entitled to the dividends received deduction with respect to the accumulated DISC income taxable to it as a result of the disqualification of International.

The petitioners contest the validity of such regulations and rely on the language of section 246(d), which provides:

SEC. 246(d). DIVIDENDS FROM A DISC OR FORMER DISC.—No deduction shall be allowed under section 243 in respect of a dividend from a corporation which is a DISC or former DISC (as defined in section 992(a)) to the extent such dividend is paid out of the corporation's accumulated DISC income or previously taxed income, or is a deemed distribution pursuant to section 995(b)(1).

They argue that section 246(d) disallows a dividends received deduction under section 243 in only three circumstances: (1) Where the dividend is *paid* out of accumulated DISC income; (2) where the dividend is *paid* out of previously taxed income; or (3) where the dividend is a *deemed distribution* pursuant to *section 995(b)(1)*. Thus, they argue that section 246(d) is inapplicable to a dividend deemed distributed out of accumu-

lated DISC income pursuant to section 995(b)(2). Accordingly, they maintain that to the extent sections 1.246–4 and 1.995–1(a)(5), Income Tax Regs., disallow a dividends received deduction for deemed as well as actual distributions from accumulated DISC income, such regulations are invalid since they ignore the express distinction made by the statute between the use of the words "paid" and "deemed." They recognize that Congress may have committed an "egregious error in choosing the words" of the statute, but they contend that we must interpret such statute literally and that if a mistake was made, it is for Congress, and not the Treasury or the courts, to correct it. We must disagree.

The Commissioner has broad authority to promulgate all needful regulations. Sec. 7805(a); *United States v. Correll*, 389 U.S. 299, 306–307 (1967). The Supreme Court in strong and unequivocal terms has repeatedly declared that Treasury regulations should not be struck down lightly (see, e.g., *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981); *Bingler v. Johnson*, 394 U.S. 741, 749–750 (1969); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); *Colgate-Palmolive-Peet Co. v. United States*, 320 U.S. 422, 426 (1943); *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931); *Brewster v. Gage*, 280 U.S. 327, 336 (1930)), and—

it is fundamental, of course, that as "contemporaneous constructions by those charged with administration of" the Code, the Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes," and "should not be overruled except for weighty reasons." *Commissioner * * * v. South Texas Lumber Co.*, 333 U.S. 496, 501 * * * [*Bingler v. Johnson*, 394 U.S. at 749–750.]

See also *Arrow Fastener Co. v. Commissioner*, 76 T.C. 423, 430 (1981); Griswold, "A Summary of the Regulations Problem," 54 Harv. L. Rev. 398, 404 (1941).

It is well established that in interpreting legislation, the Court should consider not only the words of the statute, but also the effect of the interpretation of those words. See, e.g., *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 51–52 (1955); *Helvering v. Gregory*, 69 F.2d 809, 810–811 (2d Cir. 1934), affd. 293 U.S. 465 (1935); *Estate of Glen v. Commissioner*, 45 T.C. 323, 333 (1966). If the proposed interpretation of the statute clearly fails to carry out the clear purpose of the

legislation, then, generally, it should be rejected. See *Corn Products Refining Co. v. Commissioner, supra*; *Helvering v. Clifford*, 309 U.S. 331 (1940); *Estate of O'Connor v. Commissioner*, 69 T.C. 165, 178 (1977). To judge the reasonableness of the regulations and the effect of the interpretation urged by the petitioners, it is necessary to examine and consider the plan for the taxation of DISCs and their shareholders and the policies behind such plan.

Generally, a DISC is not subject to taxation. Sec. 991. However, during the years a corporation qualifies as a DISC, a portion of the annual earnings and profits of the DISC is deemed distributed as a dividend to its shareholders and is referred to as previously taxed income. Sec. 996(f)(2); sec. 1.996–3(c), Income Tax Regs. Such a distribution is deemed to be received by the shareholders on the last day of the taxable year of the DISC and is taxable to them at that time, regardless of whether it is actually paid. Sec. 995(b)(1). When there is an actual distribution to a shareholder of previously taxed income, such distribution is not taxable. Sec. 996(a)(3); sec. 1.995–1(a)(3), Income Tax Regs. The earnings and profits of the DISC which are not deemed distributed (referred to as accumulated DISC income[4]) are generally not taxable so long as they are not actually distributed as a dividend, but when such income is in fact distributed, it is taxable. Sec. 996(a)(1); secs. 1.995–1(a)(4), 1.996–3(b), Income Tax Regs. A DISC may also have some earnings and profits (termed "other earnings and profits") which were earned before it qualified as a DISC and which were subject to taxation. See sec. 996(f)(3); sec. 1.996–3(d), Income Tax Regs. When an actual distribution is made to a shareholder out of the earnings and profits of the DISC, or former DISC, section 996(a)(1) provides that such a distribution shall be treated as made, to the extent thereof, first out of previously taxed income, second out of accumulated DISC income, and finally out of other earnings and profits. See sec. 1.996–1(a), Income Tax Regs.

Section 995(b)(2) provides that a shareholder of a corporation which revoked its election to be taxed as a DISC, or which failed to qualify as a DISC for a taxable year, is deemed to have

---

[4] It is out of such income that producer's loans may be made. See sec. 993(d)(1)(A).

received a distribution taxable as a dividend equal to such shareholder's pro rata share of the accumulated DISC income, regardless of whether such income is paid to him at that time. The effect of such provision is to tax to the shareholders of the DISC the income on which the tax had been deferred. However, such income (also termed previously taxed income) is generally not taxable to the shareholder when actually distributed. Sec. 996(a)(3); sec. 1.996–3(c)(1)(iii), Income Tax Regs.

Generally, a corporation receiving a dividend from a domestic corporation is entitled to a deduction under section 243. The purpose of such intercorporate dividends received deduction is to prevent, for the most part, the multiple taxation of dividends as they pass from one corporation to another. However, since a DISC is generally not subject to taxation on its earnings and profits (sec. 991), Congress saw no reason to provide for an intercorporate dividends received deduction for dividends distributed to corporate shareholders of a DISC. H. Rept. 92–533, *supra*, 1972–1 C.B. at 547; S. Rept. 92–437, *supra*, 1972–1 C.B. at 628. Thus, section 502 of the Revenue Act of 1971, Pub. L. 92–178, 85 Stat. 549, added section 246(d) to the Code for the general purpose of denying a dividends received deduction with respect to dividends actually received, or deemed to have been received, from a DISC. The language of the House and Senate reports mirrors the language of section 246(d), except that such reports use the language "dividends * * * are *out of* accumulated DISC income, or previously taxed income" and omit the statutory term "*paid*." H. Rept. 92–533, *supra*, 1972–1 C.B. at 547, 628; emphasis added. However, to the extent an actual distribution is out of "other earnings and profits," it is eligible for the dividends received deduction of section 243. See sec. 246(d); H. Rept. 92–533, *supra*, 1972–1 C.B. at 547; S. Rept. 92–437, *supra*, 1972–1 C.B. at 628.

Sections 1.246–4 and 1.995–1(a)(5), Income Tax Regs., were clearly adopted contemporaneously with the enactment of the statutory provisions, and it may be assumed that the draftsmen of such regulations were in a peculiar position to understand and reflect the objectives of the framers of the statute. See *Bingler v. Johnson, supra.* Furthermore, such regulations carry out the evident purpose of the statutory

provision: where the income of the DISC is not subjected to corporate tax, there is no reason to allow its corporate shareholders a dividends received deduction. See H. Rept. 92–533, *supra*, 1972–1 C.B. at 547, 548; S. Rept. 92–437, *supra*, 1972–1 C.B. at 628–629. On the other hand, where the income of the corporation has been subjected to the corporate tax, it is consistent with the general policy of section 243 to allow the corporate shareholders a dividends received deduction with respect to the distribution of such income, and the deduction is allowed in such a situation. Sec. 1.246–4, Income Tax Regs.; see H. Rept. 92–533, *supra*, 1972–1 C.B. at 547; S. Rept. 92–437, *supra*, 1972–1 C.B. at 628. In addition, the clear implication of the committee reports is that no significance should be attached to the use of the word "paid" in interpreting the statutory provisions.

On the contrary, to adopt the interpretation urged by the petitioners would be utterly inconsistent with the legislative purposes and would confer on Farms a clearly unintended windfall—it would receive a dividends received deduction with respect to a dividend out of earnings and profits that had not been subjected to the corporate tax. Even they recognize that it would be inconsistent to allow a dividends received deduction for a deemed distribution of accumulated DISC income under section 995(b)(2), whereas the shareholders are not allowed a dividends received deduction with respect to other dividends received, or deemed received, out of accumulated DISC income. Finally, if a dividends received deduction is allowed for a deemed distribution of accumulated DISC income under section 995(b)(2), the effect of such allowance would be that such income would never be taxed either to the DISC or to its corporate shareholders.

Our view is reinforced by the enactment of section 502(e) of the Revenue Act of 1971, *supra*, 85 Stat. 550, which added section 1504(b)(7) to the Code. Such section provides that a DISC, or a former DISC, may not be included in a group of affiliated corporations which elect to file a consolidated tax return. The congressional rationale for enacting such provision was that the effect of including a DISC within an affiliated group which files a consolidated return would be to allow a 100-percent dividends received deduction on dividends flowing from one member of the group to another. "The

allowance of this treatment, like the allowance of the general dividends received deduction, is not compatible with the principle that earnings of a DISC are not to be taxed in the ·hands of the DISC but rather are to be taxed in the hands of its shareholders." H. Rept. 92–533, *supra*, 1972–1 C.B. at 548; S. Rept. 92–437, *supra*, 1972–1 C.B. at 629. Accordingly, we hold that sections 1.246–4 and 1.995–1(a)(5), Income Tax Regs., are valid and that Farms is not entitled to a dividends received deduction for the accumulated DISC income deemed distributed to it under section 995(b)(2) upon the disqualification of International.

To give effect to other adjustments,

*Decisions will be entered under Rule 155.*