DRESSER INDUSTRIES, INC. AND CONSOLIDATED
SUBSIDIARIES, PETITIONERS v. COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 14531-85, 13531-86.     Filed June 19, 1989.

*John C. Klotsche, Karen A. Kuenster, Thomas M. Haderlein, Gregg D. Lemein, Barbara C. Spudis,* and *Malcolm D. Lambe,* for the petitioners.
*Richard D. Ames* and *W. Jere Blackshear,* for the respondent.

PARR, *Judge:* By separate statutory notices, respondent determined deficiencies in petitioners' Federal income tax for the years ending October 31, 1976 (1976), and October 31, 1977 (1977), in the amounts of $673,545.64 and $469,209, respectively. The parties have stipulated that these amounts were determined in error, and that the correct deficiencies for 1976 and 1977 are $672,173 and $554,043, respectively. For convenience, we refer hereinafter to petitioners in the singular.

After concessions, the issues for decision are: (1) Whether petitioner is entitled to net interest income against interest expense in determining the amount of deduction to be allocated and apportioned in computing the combined taxable income of petitioner and Dresser International Sales Corp. under section 994(a)(2);[1] and (2) whether petitioner is required by section 1.944-1(c)(6)(v), Income Tax Regs., to reduce combined taxable income by the entire amount of discount arising from the sale of export accounts receivable from petitioner to Dresser International Sales Corp.

---

[1]Unless otherwise provided, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue.

## FINDINGS OF FACT

All of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference.

### Background

Petitioner is a Delaware corporation and a worldwide supplier of technology, products, and services to industries involved in the development of energy and natural resources. Dresser International Sales Corp. (International) was incorporated on January 3, 1972, as a wholly owned U.S. subsidiary of petitioner. During 1976 and 1977, International qualified as a Domestic International Sales Corp. (DISC) under section 992. Petitioner and International are accrual basis taxpayers with taxable years beginning on November 1 and ending on October 31. Separate Federal income tax returns were timely filed by petitioner and International for 1976 and 1977. At the time the petitions in this case were filed, petitioner's principal corporate offices were in Dallas, Texas.

Effective as of January 3, 1972, petitioner and International entered into a written agreement for export sale and promotion (commission agreement) pursuant to which petitioner appointed International as its exclusive agent for the sale of export property (as defined in section 993(c)) outside the United States and its possessions. In the commission agreement, petitioner agreed to pay International a commission equal to the maximum commission permitted to be received by a DISC under section 994. Petitioner determined the amount of commissions due International pursuant to the commission agreement as in effect during 1976 and 1977 on a division by division basis and using the "50-50 combined taxable income" and "4 percent gross receipts" intercompany pricing methods described in section 994(a).

### Interest Expense Allocation and Apportionment

For purposes of computing DISC combined taxable income (CTI) from export sales for 1976 and 1977, in order to determine International's DISC commission under section 994(a)(2), petitioner allocated its *net* interest expense among

its divisions on the basis of the assets of each division and between the domestic and export sales of each division on the basis of the dollar volume of sales in each category.[2] This method resulted in petitioner's allocating $2,202,097 and $1,175,726, respectively, of petitioner's net interest expense to gross income from export sales in computing DISC CTI for 1976 and 1977.

In his notices of deficiency, respondent determined that petitioner could not offset gross interest income against gross interest expense and allocate the difference in determining International's DISC commission for 1976 and 1977. It was stipulated that petitioner's gross interest income earned in 1976 and 1977 would not constitute "qualified gross receipts," within the meaning of section 993(a).

## Discount on Export Receivables

Pursuant to written agreements, in 1976, 1977, and prior years International purchased with recourse undivided fractional interests in petitioner's accounts receivable arising from sales of export property on which International earned a DISC commission pursuant to the commission agreement (export receivables). International purchased the export receivables at a 10-percent discount from face value, which were arm's-length purchase prices. Upon demand by International, petitioner was obligated to: (1) Supply a complete list of all export receivables in which International had an interest, identifying the name and address of the account debtor, the amount of the account, and the date on which the account arose; (2) notify each account debtor of International's interest in the account purchased; and (3) direct the account debtor to make payment directly to International, at least to the extent of International's interest therein.

On January 31, 1975, the Internal Revenue Service (Service) issued a private letter ruling (private ruling) to petitioner with regard to the tax treatment of petitioner's sale of export receivables to International. The private

---

[2]For 1976, petitioner incurred gross interest expense of $27,985,496 and earned gross interest income of $14,415,269. Thus, petitioner's 1976 net interest expense was $13,570,227. For 1977, petitioner incurred gross interest expense of $30,837,691 and earned gross interest income of $21,557,682. Thus, petitioner's 1977 net interest expense was $9,280,009.

ruling provided that: (1) International's interests in the export receivables were "qualified export assets" of International under section 993(b)(3); (2) the gains realized by International upon collection of the export receivables (discount income) were "qualified export receipts" of International under section 993(a)(1)(D); and (3) the losses petitioner incurred on sale of its export receivables to International (discount losses) were deductible by petitioner under section 165.

In 1976 and 1977, International realized discount income of $3,774,098 and $5,709,609, respectively, while petitioner incurred discount losses of $6,581,833 and $6,344,010, respectively. The parties stipulated that as to 1976 and 1977, International's discount income was a "qualified export receipt" under section 993(a), and petitioner's discount losses were deductible by petitioner under section 165.

In order to determine International's DISC commission for 1976 and 1977, petitioner computed CTI under section 994(a)(2). On its 1976 and 1977 returns, petitioner allocated its discount losses among its divisions based upon the export sales of each division, and then apportioned *all* the discount losses of each division to gross income from export sales of the division. Using this method, petitioner allocated its entire discount losses for 1976 and 1977 to gross income from export sales in computing CTI. Respondent contends this is the correct method for allocating petitioner's discount under section 1.994-1(c)(6)(v), Income Tax Regs.

Petitioner now contends that its discount losses should not have been subtracted in their entirety from gross income from export sales in computing CTI in 1976 and 1977. Instead, petitioner argues that its discount losses should have been allocated among its divisions and apportioned between domestic and export sales using the same method petitioner used in allocating its net interest expense. Therefore, petitioner contends that only $1,072,203 and $819,971, respectively, of its discount losses should have been allocated to gross income from export sales in computing CTI for 1976 and 1977.

Assuming we decide respondent's method of allocating discount losses is correct, petitioner alternatively argues

that DISC CTI should be increased by the entire amount of International's discount income for 1976 and 1977, in the amounts of $3,774,098 and $5,709,609, respectively.

OPINION

*Background*

As part of the Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 487, Congress created the DISC as a tax incentive designed to stimulate exports and to remove a tax disadvantage faced by U.S. firms engaged in exporting through domestic corporations, instead of through foreign manufacturing subsidiaries. H. Rept. 92-533 (1971), 1972-1 C.B. 498, 502, 529; S. Rept. 92-437 (1971), 1972-1 C.B. 559, 565, 609. The DISC provisions are contained in sections 991 through 997. A qualifying DISC is permitted to defer a portion of Federal tax on income derived from exports. The DISC itself is not taxed. Sec. 991. Instead, the DISC's shareholders are taxed each year on a specified portion of earnings and profits as deemed distributions. Sec. 995. Any actual distributions made by a DISC to its shareholders out of previously untaxed earnings and profits are taxable to the shareholders under sections 301 and 316; any distributions made to the shareholders out of previously taxed earnings and profits are not taxable to the shareholders. The retained earnings and profits of a DISC that are not taxed currently remain exempt from taxation until actually distributed to the shareholders (section 996(a)(1)), until a shareholder disposes of his DISC stock in a taxable transaction (section 995(c)), or until the corporation ceases to qualify as a DISC (section 995(b)(2)). *Gehl Co. v. Commissioner*, 795 F.2d 1324, 1327 (7th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court.

A DISC may operate on a "buy-sell" and/or "commission" basis. A DISC operating on a buy-sell basis purchases and resells "export property" (section 993(c)) and holds the export "accounts receivable" (section 993(b)(2)) from its foreign customers. When a DISC operates on a commission basis, the DISC's "related supplier" (section 1.994-1(a)(3)(ii), Income Tax Regs.) is the seller of the export property and holds the export accounts receivable from customers

abroad. During 1976 and 1977, International operated on a commission basis.

In order to qualify as a DISC, the requirements of section 992 must be satisfied. Section 992 requires, inter alia, that at least: (1) 95 percent of a DISC's "gross receipts" (section 993(f)) consist of "qualified export receipts" (section 993(a)); and (2) 95 percent of the DISC's assets consist of "qualified export assets" (section 993(b)). The qualified export receipts requirement was designed "To limit the application of the deferred tax treatment provided by the * * * [DISC provisions] to situations which, in fact, involve export transactions." H. Rept. 92-533, *supra*, 1972-1 C.B. at 533; S. Rept. 92-437, *supra*, 1972-1 C.B. at 614. Similarly, the qualified export asset requirement was designed to ensure that substantially all of the DISC's assets are export related. H. Rept. 92-533, *supra*, 1972-1 C.B. at 529; S. Rept. 92-437, *supra*, 1972-1 C.B. at 610.

Section 994 provides intercompany pricing rules for sales of export property by a related supplier to its DISC. These rules provide a mechanism for determining the price at which the parent corporation is deemed to have sold its products to the DISC, regardless of the price actually paid. *Bentley Laboratories, Inc. v. Commissioner*, 77 T.C. 152, 163 (1981). In the case of commission sales by a DISC, in essence, a fictional sale is deemed to have occurred between the related supplier and such DISC. Sec. 1.994-1(d)(2), Income Tax Regs.

Three intercompany pricing methods are set forth in section 994(a).[3] A DISC must use the method which results in the greatest taxable income from export sales. The first two methods are safe harbors which permit a DISC to earn

[3]SEC. 994. INTER-COMPANY PRICING RULES.

(a) IN GENERAL.—In the case of a sale of export property to a DISC by a person described in section 482, the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of—

(1) 4 percent of the qualified export receipts on the sale of such property by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts,

(2) 50 percent of the combined taxable income of such DISC and such person which is attributable to the qualified export receipts on such property derived as a result of a sale by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts, or

(3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).

the greater of 4 percent of qualified export receipts on the sale of export property or 50 percent of the CTI attributable to such receipts, plus 10 percent of the DISC's "export promotion expenses" (section 994(c)[4]). As a practical matter, the latter method only comes into play when CTI exceeds 8 percent (since 50 percent times a percentage exceeding 8 percent is necessarily greater than 4 percent). An arm's-length price, computed in accordance with section 482, is used only when it results in greater DISC profit.

Both issues in this case focus upon the computation of CTI under the pricing method contained in section 994(a)(2)—the 50-percent method.

### Interest Expense Allocation and Apportionment

The first issue we must decide is whether petitioner is entitled to net interest income against interest expense, and then to allocate and apportion the net amount in determining the CTI of petitioner and International under section 994(a)(2).

Petitioner would have us answer this question in the affirmative, and makes a rather creative argument in support of its position. Petitioner argues by analogy that the treatment of interest for purposes of computing the limitation on the percentage depletion deduction under section 613(a) should be applied in computing CTI. In contrast, respondent contends that the legislative history and regulations under section 994 require that only *gross* interest expense be allocated and apportioned in accordance with the regulations promulgated under section 861. We agree with respondent.

Section 613(a) provides that a taxpayer is entitled to a percentage depletion deduction equal to a specified percentage of the "gross income from the [mining] property," but which is limited to 50 percent of the taxpayer's "taxable

---

[4]SEC. 994. INTER-COMPANY PRICING RULES.

(c) EXPORT PROMOTION EXPENSES.—For purposes of this section, the term "export promotion expenses" means those expenses incurred to advance the distribution or sale of export property for use, consumption, or distribution outside of the United States, but does not include income taxes. Such expenses shall also include freight expenses to the extent of 50 percent of the cost of shipping export property aboard airplanes owned and operated by United States persons or ships documented under the laws of the United States in those cases where law or regulations does not require that such property be shipped aboard such airplanes or ships.

income from the [mining] property." For this purpose, "taxable income from the property" is defined as gross income from the mining property less all allowable deductions (excluding any deduction for depletion) which are attributable to the mining processes, including "financial overhead," with respect to which depletion is claimed. Sec. 1.613-5(a), Income Tax Regs.

Petitioner relies upon the Fifth Circuit's decision in *General Portland Cement Co. v. United States,* 628 F.2d 321 (5th Cir. 1980), cert. denied 450 U.S. 983 (1981). An appeal of this case would lie in the Fifth Circuit. See *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 405 U.S. 940 (1971). In *General Portland,* the Court of Appeals affirmed a decision of the District Court holding that the taxpayer's actual interest cost was the net amount, and that the taxpayer was entitled to offset its interest income against its interest expense in calculating "taxable income from the property" for purposes of the 50-percent limitation. 628 F.2d at 344.

The Fifth Circuit in *General Portland* distinguished the decision of this Court in *Island Creek Coal Co. v. Commissioner,* 30 T.C. 370 (1958). In *Island Creek,* we held that the taxpayer was not entitled to offset income realized on the sale of certain scrap items against a correlative supplies and maintenance expense account in order to reduce the account balance and increase its "taxable income from the property." 30 T.C. at 384-385. In so holding, we reasoned:

We think it is clear that "gross income from the property" has reference only to the income attributable to those mining operations defined by statute, and does not include miscellaneous income derived from the sale of scrap * * * [T]he end result of petitioner's attempt * * * was the inclusion in "gross income from the property" of the sale proceeds of that scrap, and that * * * may not be done. It is axiomatic that a taxpayer may not do by indirection that which it may not do directly * * * . [*Island Creek Coal Co. v. Commissioner, supra* at 384.]

The Fifth Circuit in *General Portland* "decline[d] to follow the implication in *Island Creek* that a technical income item can never offset an expense item." 628 F.2d at 344. *Island Creek* was distinguished "because the income at issue there was generated from a separate scrap salvage operation which salvaged waste materials that had already been used"

and that *Island Creek* would "not be *extended* to require a result which [the court] would consider inequitable and in violation of the purpose behind the '50% limitation.' " 628 F.2d at 344 n. 61. [Emphasis provided by court.]

In the more recent case of *Ideal Basic Industries, Inc. v. Commissioner,* 82 T.C. 352 (1984), this Court followed the *General Portland* decision and held that the taxpayer's net interest expense should be used in computing "taxable income from the property" for purposes of computing the 50-percent limitation on the percentage depletion deduction. 82 T.C. at 402. *Island Creek* was distinguished since "The particular facts of that case indicated that the scrap salvage operation was essentially a separate business, extraneous to the mining operation" and we also rejected "any implication that a technical income item can never offset an expense item." 82 T.C. at 402. However, we cited as authority section 1.613-5(a), Income Tax Regs., which requires that "gross income from the property" be reduced, inter alia, by an allocable portion of the taxpayer's "financial overhead" expense, which is not defined by the regulation. 82 T.C. at 401.

We agree with petitioner that the limitation provision for the percentage depletion deduction is in certain respects "conceptually" analogous to section 994(a)(2). First, both the percentage depletion deduction and DISC provisions were enacted to provide special tax incentives to encourage taxpayers to engage in a designated activity (i.e., mining or exporting). Second, the methods for computing the tax benefits of these provisions are similar. Both the percentage depletion deduction allowable under section 613 and CTI under section 994(a)(2) have limitations which are determined by computing the taxable income realized by the taxpayer engaging in the designated activity. In both cases income is computed by reducing gross income realized from the designated activity by deductions attributable thereto. Finally, in both cases the tax benefit is limited to 50 percent of the activity's income.

Respondent, however, rejects petitioner's analogy as inconsistent with both section 994's legislative history and Treasury regulations. However, in determining legislative intent, we begin with the words of the statute. The formula

in section 994(a)(2), as applied to this case, is 50 percent of the CTI of International and petitioner "which is attributable to the qualified export receipts on such [export] property derived as the result of sale." Sec. 994(a)(2). The parties have stipulated that, except for a small undetermined percentage of interest income on trade receivables in 1976, petitioner's interest income in 1976 and 1977 would not constitute "qualified export receipts," within the meaning of section 993(a). Further, by its terms, section 994(a)(2) is limited to qualified export receipts from the sale of export property, which interest income is not. Thus, a purely literal reading of section 994(a)(2) in this context would exclude petitioner's interest income from the CTI computation.

However, petitioner argues that its interest income may be included in the calculation of CTI as an offset to interest expense, even though it does not fit literally within the language of section 994(a)(2). This issue is similar to the one raised in *General Portland, Ideal Basic,* and *Island Creek* in the percentage depletion realm.

Neither party has cited, nor have we found, any authority supporting petitioner's theory that interest income and expense should be netted in computing CTI, as is the case in computing the 50-percent limitation on the percentage depletion deduction. Indeed, the House and Senate Committee Reports explaining the DISC provisions provide otherwise:

combined taxable income from the sale of export property is to be determined generally in accordance with section 861 for determining the source (within or without the United States) of the income of a single entity with operations in more than one country. These rules generally allocate to each item of gross income all expenses directly related thereto, and then apportion other expenses among all items of gross income on a ratable basis. [H. Rept. 92-533, *supra,* 1972-1 C.B. at 538; S. Rept. 92-437, *supra,* 1972-1 C.B. at 619.]

Consistent with this legislative history, section 1.994-1(c)(6)(iii), Income Tax Regs., provides:

Costs (other than cost of goods sold) which shall be treated as relating to gross receipts from sales of export property are (a) the expenses, losses, and other deductions definitely related, and therefore allocated and apportioned, thereto, and (b) a ratable part of any other expenses, losses,

or other deductions which are not definitely related to a class of gross income, determined in a manner consistent with the rules set forth in sec. 1.861-8 [Income Tax Regs].

The rules contained in section 1.861-8, Income Tax Regs., apply in determining the taxable income of a taxpayer from specific sources and activities under other Code sections, referred to as "operative sections." Sec. 1.861-8(a)(1), Income Tax Regs. The computation of CTI under section 994(a)(2) is an operative section governed by the regulation. Sec. 1.861-8(f)(1)(iii), Income Tax Regs. The rules for allocating and apportioning interest expense deductions are contained in section 1.861-8(e)(2), Income Tax Regs. This provision does not provide for the netting of interest income and expense before allocation and apportionment.

Petitioner argues that interest income and expense should be netted before allocation and apportionment, and, consequently, that we should not actually apply section 1.861-8, Income Tax Regs. Rather, petitioner argues in its reply brief that it "simply is applying the established case law in order to determine its true interest expense which must then be allocated and apportioned under the principles of section 861." In effect, petitioner asks that we accept its analogy to the percentage depletion limitation over the express requirements of the regulations under section 861. This we will not do.

As a general rule, taxpayers are not permitted to net interest income and expense in computing taxable income. See *Murphy v. Commissioner*, 92 T.C. 12 (1989). An exception to this general rule lies in the computation of the limitation on the percentage depletion deduction. Our decision in *Ideal Basic* providing for the use of net interest expense in computing the percentage depletion limitation was based upon our interpretation of the undefined term "financial overhead," contained in section 1.613-5(a), Income Tax Regs. *Ideal Basic Industries, Inc. v. Commissioner*, *supra* at 401. This same term was also undefined in the House Committee Report on the Internal Revenue Code of 1954. H. Rept. 83-1337 at A184 (1954). The presence of the broad term "financial overhead" in the legislative history and regulation (rather than simply "interest expense")

supports the use of net interest expense in computing the percentage depletion limitation.

No similar expression of legislative intent is present in the DISC provisions. Section 994 does not itself require as a statutory mandate that the allocation and apportionment rules under section 861 be applied in computing CTI. However, after considering Congressional intent, as deduced from the legislative history to section 994, it is clear that the principles applicable under section 861 are to apply. The regulations under section 861 provide a uniform and rational method for allocating and apportioning deductions, including gross interest expense. The true analogy contemplated by Congress was between the CTI computation under section 994 and other similar "operative sections" governed by the section 861 regulations.

Accordingly, we hold for respondent.

### Discount on Export Receivables

The second and final issue for decision regards the proper treatment of petitioner's discount losses incurred on the sale of export receivables from petitioner to International, in computing the CTI of petitioner and International under section 994(a)(2).

Since International operated on a commission basis, accounts receivable arising upon the sale of export property were originally held by petitioner. By written agreement, petitioner sold, with recourse, undivided interests in such receivables to International at a discount.[5] The parties stipulated that the purchase prices were arm's-length. The benefits to petitioner of such transfers are essentially threefold. First, the transferred receivables constitute "qualified export assets" in the hands of International, and may thus be included in meeting the requirement that at least 95

---

[5]The parties stipulated that the receivables transferred from petitioner to International were "sold." Whether a sale has occurred is a question of fact centering upon the question of whether substantial incidents of ownership have been relinquished. See, e.g., *Town & Country Food Co. v. Commissioner*, 51 T.C. 1049 (1969). Further, the economic substance of a transaction controls over legal form for Federal tax purposes. See *Gregory v. Helvering*, 293 U.S. 465 (1935). All loans from a DISC to a related supplier must meet the requirements of the producer loan provisions in sec. 993(d). If "purchased" receivables were recharacterized as merely security for a loan, the requirements of sec. 993(d) would most certainly not be satisfied; thereby risking disqualification as a DISC. This question has not been placed at issue by either party in this case. Accordingly, we do not decide it.

percent of DISC assets be qualified export assets.[6] Second, the discount income realized by International upon collection of the receivables constitutes "qualified export receipts"; thereby assisting in meeting the requirement that at least 95 percent of a DISC's gross receipts be qualified export receipts and by providing DISC income subject to deferral benefits. Finally, the sale of receivables gave petitioner a means to obtain funds from International without having to comply with the more stringent "producer loan provisions" of section 993(d). See generally R. Feinschreiber, "How a DISC Can Use Trade Receivables to Best Advantage," 3 Intl. Tax J. 452 (1977).

Petitioner argues that it is entitled to allocate and apportion its discount losses as a component of interest expense in computing CTI. In the alternative, petitioner argues that it is entitled to offset International's discount income against petitioner's discount losses in computing CTI, and to include International's discount income a second time in DISC taxable income. In contrast, respondent points out that section 1.994-1(c)(6)(v),[7] Income Tax Regs., precludes either action petitioner suggests. Instead, CTI must be reduced by the total amount of discount when export

---

[6]The House and Senate Committee Reports confirm this treatment:

*Qualified export assets.*—As previously indicated, 95 percent of a corporation's assets must be export related if the corporation wishes to qualify as a DISC. The types of assets classified as qualified export assets are—

\*      \*      \*      \*      \*      \*      \*

(3) accounts receivable and evidences of indebtedness of the corporation (or if the corporation acts as an agent, the principal) held by the corporation which arose in connection with [a] qualified export sale \* \* \*. [Emphasis added.]
[H. Rept. 92-533, *supra*, 1972-1 C.B. at 533; S. Rept. 92-437, *supra*, 1972-1 C.B. at 614.]

[7]Sec. 1.994-1(c)(6), Income Tax Regs., defines CTI and provides in relevant part:

(6) *Combined taxable income.* For purposes of this section, the combined taxable income of a DISC and its related supplier from a sale of export property is the excess of the gross receipts (as defined in section 993(f)) of the DISC from such sale over the total costs of the DISC and related supplier which relate to such gross receipts. Gross receipts from a sale do not include interest with respect to the sale. \* \* \* In determining the gross receipts of the DISC and the total costs of the DISC and related supplier which relate to such gross receipts, the following rules shall be applied:

\*      \*      \*      \*      \*      \*      \*

(v) If an account receivable arising with respect to a sale of export property is transferred by the related supplier to a DISC which is a member of the same controlled group within the meaning of sec. 1.993-1(k) for an amount reflecting a discount from the selling price taken into account in computing (without regard to this subdivision) combined taxable income of the DISC and its related supplier, then the combined taxable income from such sale shall be reduced by the amount of the discount.

receivables are transferred by a related supplier to a DISC. However, petitioner contends in its primary argument that respondent's regulation is invalid.

The parties' stipulation of facts contained the following illustration, based upon hypothetical facts, to demonstrate their respective arguments:

| | Per taxpayer | | |
| --- | --- | --- | --- |
| | Per IRS | Primary position | Alternative position |
| Sales of export property | $100,000 | $100,000 | $100,000 |
| Other (collected discounts) | - - - | - - - | 10,000 |
| Cost of sales | (50,000) | (50,000) | (50,000) |
| | 50,000 | 50,000 | 60,000 |
| Discount loss (section 165) | (10,000) | [1](2,000) | (10,000) |
| Combined taxable income (CTI) | 40,000 | 48,000 | 50,000 |
| Commission income (50%)[2] | 20,000 | 24,000 | 25,000 |
| * * * * * * * | | | |
| Other qualified export | | | |
| Receipts (collected discounts) | 10,000 | 10,000 | 10,000 |
| DISC operating expense | - - - | - - - | - - - |
| Total DISC taxable income | 30,000 | 34,000 | 35,000 |
| * * * * * * * | | | |

[1]Assumes arbitrarily that under Treas. Reg. sec. 1.861-8, 80% of the discount loss is allocable to the Taxpayer's domestic sales and 20% is allocable to the Taxpayer's export sales.
[2]The commission income is deductible by the related supplier as commission expense and paid to the DISC.

A portion of DISC taxable income is in turn treated as a deemed distribution to the related supplier. Sec. 995.

Before reaching the merits of the issue before us, we must determine the appropriate standard of review of respondent's regulation. We consider the source of the authority to promulgate the regulation in making our determination. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982). Respondent argues that the regulation was issued under section 994(b)(1),[8] while petitioner argues that the regulation was issued under the general grant of authority contained

[8]SEC. 994. INTER-COMPANY PRICING RULES.
(b) RULES FOR COMMISSIONS, RENTALS, AND MARGINAL COSTING.—The Secretary shall prescribe regulations setting forth—
(1) rules which are consistent with the [intercompany pricing] rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income.

in section 7805(a).[9] Relatively less deference is owed to an "interpretive" regulation issued under sec. 7805(a) than to a "legislative" regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision. *United States v. Vogel Fertilizer Co., supra* at 24; *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981).

Section 994(b)(1) grants specific authority to prescribe regulations setting forth "rules which are consistent with the [intercompany pricing] rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income."[10] The delegation of authority in section 994(b)(1) was necessary since the intercompany pricing rules of section 994(a) literally cover only situations where export property is first sold to a DISC by a related supplier (i.e., a DISC operating on a buy-sell basis). Thus, regulations were needed to provide guidance as to the application of the intercompany pricing rules to situations where a DISC acts as a commission agent. Section 1.994-1(d), Income Tax Regs.,[11] was issued under section

---

[9]SEC. 7805. RULES AND REGULATIONS.

(a) AUTHORIZATION.—Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

[10]The House and Senate Committee Reports provide:

the Secretary of the Treasury may prescribe by regulations intercompany pricing rules, consistent with those provided by the bill, in the case of export transactions where the DISC does not take title to the property, but instead, acts as commission agent for the sale, or is a lessee of the property which it then subleases to customers. [H. Rept. 92-533, *supra,* 1972-1 C.B. at 538; S. Rept. 92-437, *supra,* 1972-1 C.B. at 619.]

[11]Sec. 1.994-1(d), Income Tax Regs., provides in relevant part:

(d) *Rules under section 994(a)(1) and (2) for transactions other than sales.* The following rules are prescribed for purposes of applying the gross receipts method or combined taxable income method to transactions other than sales:

      \*      \*      \*      \*      \*      \*      \*

(2) *Commissions.* If any transaction to which section 994 applies is handled on a commission basis for a related supplier by a DISC and such commissions give rise to qualified export receipts under section 993(a)—

(i) The amount of the income that may be earned by the DISC in any year is the amount \* \* \* which the DISC would have been permitted to earn under the gross receipts method, the combined taxable income method, or section 482 method if the related supplier had sold (or leased) the property or service to the DISC and the DISC in turn sold (or subleased) to a third party, whether or not a related party, and

(ii) The maximum commission the DISC may charge the related supplier is the sum of the amount of income determined under subdivision (i) of the subparagraph plus the DISC's total

994(b)(1) and essentially provides that a fictional sale is deemed to have occurred between a related supplier and a DISC operating on a commission basis for purposes of applying the intercompany pricing rules.

We conclude that section 1.994-1(c)(6)(v), Income tax Regs., was also issued under the authority of section 994(b)(1). It is clear that only a DISC operating on a commission basis can purchase export receivables from a related supplier, and consequently create discount governed by the regulation. This is necessarily so since a DISC operating on a buy-sell basis would, by definition, already hold export receivables. Respondent's regulation provides an intercompany pricing rule which is only applicable in the case of commissions, as authorized by section 994(b)(1).

In this case, however, even though we conclude that the challenged regulation was issued under section 994(b)(1), it would also survive scrutiny under the less deferential standard of review applied to interpretative regulations issued under section 7805(a).

In *Anchor Hocking Corp. v. United States,* 11 Cl. Ct. 173 (1986), the Claims Court upheld the validity of section 1.994-1(c)(6)(v), Income Tax Regs., on facts identical in all material respects to the instant case. The Claims Court stated, without discussion, that the regulation was promulgated under section 7805. 11 Cl. Ct. at 175.

An interpretative regulation is valid if it harmonizes with the plain language of the statute, its origins, and its purpose. *United States v. Vogel Fertilizer Co., supra; National Muffler Dealers Association v. United States,* 440 U.S. 472, 477 (1979). A regulation which contradicts the unambiguous language of a statute is invalid. *Citizen's Bank of Waco v. United States,* 417 F.2d 675, 679 (5th Cir. 1969). Where the language of the statute is unambiguous and its directive specific, there is no power to add restrictions to a statute by regulation. *Durbin Paper Stock Co. v. Commissioner,* 80 T.C. 252, 257 (1983); *Estate of Boeshore v. Commissioner,* 78 T.C. 523, 527 (1982); *Arrow Fastener Co. v. Commissioner,* 76 T.C. 423, 430 (1981); *Caterpillar Tractor Co. v. United States,* 218 Ct. Cl. 517, 526, 589 F.2d

---

costs for the transaction as determined under paragraph (c)(6) of this section [combined taxable income].

1040, 1045 (1978). If a regulation does not clearly contradict or limit the language of the statute it purports to interpret, it is nevertheless invalid if it is inconsistent with the statute's origin and purpose. *CWT Farms, Inc. v. Commissioner,* 79 T.C. 1054, 1062 (1982), affd. 755 F.2d 790 (11th Cir. 1985) (hereinafter cited as *CWT Farms II*).

In certain cases, however, the statutory language may be "so general * * * as to render an interpretive regulation appropriate." *Helvering v. R.J. Reynolds Co.,* 306 U.S. 110, 114 (1939), quoted in *United States v. Vogel Fertilizer Co., supra* at 25-26, and *National Muffler Dealers Association, Inc. v. United States, supra* at 476. In such a situation, we customarily defer to a regulation if it "implements the congressional mandate in some reasonable manner." *United States v. Correll,* 389 U.S. 299, 307 (1967), quoted in *United States v. Vogel Fertilizer Co., supra* at 24.

The statutory language of section 994(a)(2) is not specific. It is also clear that the challenged regulation does not conflict with the language of section 994(a)(2). Thus, we need only decide whether section 1.994-1(c)(6)(v), Income Tax Regs., harmonizes with the origin and purpose of the statute. We think it does.

The DISC legislation was intended to encourage domestic corporations to export U.S. goods. See H. Rept. 92-533, *supra,* 1972-1 C.B. at 502, 529; S. Rept. 92-437, *supra,* 1972-1 C.B. at 565, 609. However, Congress also clearly intended to limit deferral benefits "to situations which, in fact, involve export transactions." H. Rept. 92-533, *supra,* 1972-1 C.B. at 533; S. Rept. 92-437, *supra,* 1972-1 C.B. at 614. Allowing a commission basis DISC to purchase export receivables from its related supplier achieves a parity with DISC's operating on a buy-sell basis in meeting the qualification requirement that at least 95 percent of DISC assets be qualified export assets (Sec. 992(a)(1)(B)). However, by reducing deferral benefits attributable to the discount resulting from the simple expedient of "selling" export receivables between related parties, respondent's regulation is consistent with Congressional intent.

Our decision is further supported by the similar treatment afforded producer loans and discounting transactions under respondent's regulation. A DISC is permitted to loan tax-

deferred profits back to its parent manufacturing company (a producer loan) if the requirements of section 993(d) are satisfied. Like discount income, interest income on a producer loan is a qualified export receipt to a DISC. See secs. 993(a)(1)(F) and 993(b)(5). However, in order to limit DISC deferral benefits on this type of transaction, Congress provided in section 995(b)(1)(A) that interest on producer loans be deemed distributed to a DISC's shareholders. Accordingly, the net effect to the producer-borrower is zero, since the deemed distribution of the DISC's producer loan interest income offsets the correlative interest expense of the producer-borrower. Section 1.994-1(c)(6)(v), Income Tax Regs., is similar in purpose to the producer loan provisions, but achieves the desired result by requiring that CTI be reduced by the full amount of any discount.[12] The regulation prevents the amount of income measured by the discount from being taken into account twice in determining DISC taxable income—first as a component of CTI, and second as a qualified export receipt included in DISC taxable income but excluded from CTI.

Petitioner argues that the creation of an export receivable and the subsequent discounting are two separate and distinct transactions. As a matter of general principle outside the DISC area, petitioner is correct. It is well established that the subsequent history of an account receivable arising on a sale does not affect the amount of gross income originally realized on such sale. See *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182 (1934). Petitioner then reasons that, under this principle, discount losses are not definitely related to gross receipts on the sale of export property, and thus CTI should not be reduced by the full amount of discount. Rather, petitioner's primary argument is that both the legislative history to section 994,

---

[12]T.D. 7435, 1976-2 C.B. 238, provides further explanation of the challenged regulation:

The rule proposed in sec. 1.994-1(c)(6)(v), with respect to determination of combined taxable income has been slightly modified to avoid any inference that a transfer at a discount of an account receivable can result in a deductible loss [in computing CTI]. If a related supplier transfers an account receivable to its DISC at a discount, the amount of such discount will, in effect, be excluded from combined taxable income. It is understood that the discounts described in such provisions which arise on the transfer of accounts receivable by a related supplier to a DISC may be grouped in the same manner that the transactions to which such accounts receivable relate are grouped by the taxpayer pursuant to sec. 1.994-1(c)(f) [Income Tax Regs].

and section 1.994-1(c)(6)(iii), Income Tax Regs., require that only a ratable portion of the discount be deducted in a manner consistent with section 861.

We think that petitioner's reliance upon the general principle announced in *Spring City Foundry* is misplaced. A DISC which acts as a commission agent could be a mere "paper corporation" used solely to "earn" sheltered income in the form of commissions on sales by the producer. *CWT Farms II, supra* at 1066. Acceptance of petitioner's argument in this case would not further Congressional intent but hinder it. Accordingly, we judge the reasonableness of respondent's regulation by considering "the plan for the taxation of DISCs and their shareholders and the policies behind such a plan." *CWT Farms, Inc. v. Commissioner,* 79 T.C. 86, 98 (1982) *(CWT Farms I).* We uphold respondent's regulation because it is consistent with the origin and purpose of the DISC provisions.

We summarily reject petitioner's alternative argument since a simple reading of section 994(a)(2) makes clear that the only qualified export receipts to be taken into account in computing CTI are those generated by the sale of export property. Adding back discount income, as petitioner suggests, would conflict with the plain language of section 994(a)(2).

To reflect the foregoing,

*Decisions will be entered under Rule 155.*